UNITED STATES of America, Appellee,

v.

Esau JACKSON, Appellant.

UNITED STATES of America, Appellee,

v.

Clarence Gene SCROGGINS, Appellant.

UNITED STATES of America, Appellee,

v.

William Franklin DANCY, Appellant.

Nos. 81–2411, 81–2412 and 81–1342.

United States Court of Appeals,
Eighth Circuit.

Submitted June 17, 1982.

Decided Dec. 28, 1982.

Rehearing and Rehearing En Banc Denied Feb. 14, 1983.

Certiorari Denied April 4, 1983.
See 103 S.Ct. 1531.

---

**9.** In light of our holding, we need not reach the other grounds for reversal urged by the plain-  tiffs.

Al Moskowitz, Asst. Federal Public Defender, W.D.Mo., James R. Wyrsch, Kansas City, Mo., for appellant.

Stinson, Mag & Fizzell, George E. Feldmiller, Charles W. German, Kansas City, Mo., for appellant William Franklin Dancy.

Robert G. Ulrich, U.S. Atty., J. Whitfield Moody, Cynthia A. Clark, Asst. U.S. Attys., Kansas City, Mo., for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and REGAN,* Senior District Judge.

HEANEY, Circuit Judge.

This appeal arises from three convictions obtained by the government in its attempt to bust an alleged "arson-for-profit" ring operating in Kansas City, Missouri. We reverse the conviction of Clarence Gene Scroggins, reverse the conviction of Esau Jackson in part and affirm the conviction of William Franklin Dancy.

## I.

## INTRODUCTION.

On August 23, 1977, a house located at 53rd and Agnes Street in Kansas City burned to the ground (the "Agnes fire"). Fire department investigators determined that the fire had been purposely set. The owner of the home, Samuel Edmunds, collected $14,116.66 on his homeowner's policy as a result of the fire. Appellant Scroggins, who was renting the premises from Edmunds at the time, collected $16,142.08 on his renter's insurance policy for the damage to his household goods and belongings.

Nearly seven months later, on March 21, 1978, a home owned by appellant Dancy, located at 4011 East 51st Street, was severely damaged by fire (the "51st Street" fire). The police determined that arson was the cause. Dancy's claim on his homeowner's insurance policy was paid in the amount of $20,000. The holder of a renter's insurance policy on the premises, Karen Hicks, sought compensation for alleged fire damage to the contents of the dwelling, but this claim was denied.

Two more fires occurred in June, 1978, and police investigators determined that both were the result of arson. On June 24, an apartment building located at 2547 Troost burned (the "Troost fire"). Samuel Edmunds, the owner of the building, received $14,497.67 in insurance proceeds.

Three days later, a fire occurred at 2632 Indiana Street, a house owned by JoAnn Hillmon Murray, a paramour of appellant Dancy. Murray received $12,400 on her homeowner's policy to compensate for the fire damage.

On April 24, 1981, an indictment was filed against Edmunds, Murray, and appellants Scroggins, Jackson and Dancy in connection with the four above-described fires. Count I of the indictment charged the five defendants with conspiracy to commit mail fraud. That count alleged that the five had conspired with Charles Morgan, an unindicted confederate, to set fire to the four premises in order to fraudulently obtain insurance proceeds from various insurance companies through the use of the United States mail. Counts II through V charged Dancy and Jackson with substantive violations of 18 U.S.C. § 1341, the mail fraud statute, in connection with mailings that resulted from the 51st Street fire. Counts VI through VIII alleged wrongful use of the mails by Edmunds and Jackson to collect insurance proceeds from the Troost fire. Counts IX through XI charged Murray, Jackson and Dancy with mail fraud in connection with the Indiana fire. No substantive mail fraud violations were charged as a result of the Agnes fire.

All five defendants were jointly tried, despite repeated severance motions by each defendant. The government's chief witness at trial was Charles Morgan, the self-proclaimed "torch" for the four fires. Morgan testified that in August, 1977, Scroggins entered into a contract with him to burn the residence on Agnes Street that Scroggins was renting from Edmunds. Morgan claimed that Edmunds played no part in his scheme. Morgan further testified that Edmunds introduced him to appellant Jackson, and that one or two months after the introduction, Morgan and Jackson agreed that Morgan would torch the 51st Street property. Three weeks after the 51st Street fire, Morgan and Jackson negotiated a "package

---

* The HONORABLE JOHN K. REGAN, Senior District Judge for the Eastern District of Mis-   souri, sitting by designation.

deal" for the destruction of four more properties: the Troost apartments, the Indiana house and two houses that were never burned. Morgan testified that Dancy was the "money man" behind Jackson in the arson dealings and directly implicated Edmunds in at least the Troost fire dealings. Morgan stated that he did not know JoAnn Murray, and that he dealt only with Jackson in regard to the burning of the Indiana house owned by Murray.

At the conclusion of its evidence, the government dismissed its charges against Murray. The jury found Scroggins guilty of conspiracy, the only count on which he was charged. The jury convicted Jackson of conspiracy, and on three of the four mail fraud counts relating to the 51st Street fire; Jackson was acquitted on the six mail fraud counts involving the Troost and Indiana fires. Edmunds was acquitted on all counts. The jury could not reach a verdict as to Dancy on either the conspiracy or substantive counts. Dancy was later retried, and was found guilty on all charges filed against him: conspiracy and the seven mail fraud violations resulting from the 51st Street and Indiana fires.

Scroggins was sentenced to two years imprisonment on his conspiracy conviction. Jackson received concurrent five-year sentences on each of his three mail fraud convictions and on the conspiracy conviction. Dancy was sentenced to three years imprisonment on each of the seven mail fraud counts and on the conspiracy count, all to run concurrently. All three convicted defendants appeal.

## II.

### SCROGGINS AND JACKSON.

#### Single vs. Multiple Conspiracies.

The most troublesome issue in this appeal is raised by both Scroggins and Jackson. They contend that the government failed as a matter of law to prove the existence of the single conspiracy alleged in the indictment, and that the proof at most showed that two separate conspiracies were in operation: one involving the Agnes fire, and another aimed at executing the Indiana, Troost and 51st Street fires. Scroggins and Jackson argue that this variance between the government's pleading and its proof prejudiced their right to a fair trial. This argument is not shared by Dancy on appeal because at his retrial, all references to the Agnes fire were eliminated from the government's case. We agree that the government failed to prove the single conspiracy alleged and find that Scroggins and Jackson's conspiracy convictions must be reversed. We conclude, however, that Jackson's convictions on the three substantive mail fraud counts were unaffected by this error.

■ To resolve the question of whether the government's proof showed that a single conspiracy existed involving at least Scroggins and Jackson, we must determine "whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). The agreement need not be express or formal, and its existence may be inferred from the actions of the parties. *United States v. Wrehe,* 628 F.2d 1079, 1082 (8th Cir.1980); *United States v. Jackson,* 549 F.2d 517, 530–531 (8th Cir.), *cert. denied,* 431 U.S. 923, 97 S.Ct. 2195, 53 L.Ed.2d 236 (1977).

■ Viewing the evidence in the light most favorable to the verdict,[1] we find that no jury could reasonably conclude that Scroggins and Jackson were parties to a single overall agreement to commit acts of arson and mail fraud. The existence of a single agreement could have been inferred if the evidence had revealed that the alleged participants shared "a common aim or purpose." *United States v. Bertolotti,* 529

1. *E.g., United States v. Luschen,* 614 F.2d 1164, 1174 (8th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); *United States v. Schmaltz,* 562 F.2d 558, 559 (8th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 345, 54 L.Ed.2d 315 (1977); *United States v. Jackson,* 549 F.2d 517, 529 (8th Cir.), *cert. denied,* 431 U.S. 923, 97 S.Ct. 2195, 53 L.Ed.2d 236 (1977).

F.2d 149, 154 (2d Cir.1975); *Hayes v. United States,* 329 F.2d 209, 213–214 (8th Cir.), *cert. denied,* 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). No such evidence was offered, however. There was testimony from which the jury could conclude that Scroggins had agreed with Morgan that the latter would burn Scroggins' rented dwelling and be compensated with a portion of the fraudulently obtained insurance proceeds. There is no evidence, however, from which the jury could infer that Scroggins had any intention of fostering illegal activity beyond the burning of his own dwelling. Similarly, the jury could have found that Jackson joined forces with Morgan, Dancy and others to execute a number of fires—but the Agnes fire was not one of them. The absence of a common aim or purpose is further revealed by the fact that, as the government admits, Scroggins in no way profitted from the later fires and Jackson received no proceeds from the Agnes fire. In sum, the evidence did not reveal "the common purpose of a single enterprise;" at most, it showed "similar purposes of * * * separate adventures of like character." *Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946).

Further, there is no evidence of "mutual dependence and assistance" among Scroggins and the other prosecuted coconspirators. *See United States v. Bertolotti, supra,* 529 F.2d at 154. Scroggins did not help plan or execute the 51st Street, Troost or Indiana fires; in fact, there is no evidence that he even knew about their occurrence. The government concedes that neither Jackson nor Dancy had anything to do with the Agnes fire, and points to no evidence that they were aware of it.

Relatedly, we cannot infer "from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Bertolotti, supra,* 529 F.2d at 154. Scroggins did not, as the government contends, "establish a structure that became a continuing focal point of crime." Scroggins' alleged scheme was a simple one, involving only two actors. The success or failure of the venture depended solely on Morgan's incendiary finesse and on Scroggins' ability to convince the insurance company that his claim was legitimate. *Cf., United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982) (hierarchical division of labor among arson ring members evinces members' knowledge of overall conspiracy). Although the later alleged fraudulent scheme was a more elaborate one that involved multiple fires, it is clear from the record that Jackson and Dancy knew the precise scope of their "operation" and that its scope did not encompass Scroggins or any other unidentified minions.

The government concedes, as it must, that the fact that Scroggins, Jackson and Dancy retained the same "torch"—Morgan—does not alone make them confederates. *See Kotteakos v. United States, supra,* 328 U.S. at 755, 66 S.Ct. at 1243; *United States v. Levine,* 546 F.2d 658, 665 (5th Cir.1977). It argues instead that the activities of Samuel Edmunds provide a sufficient nexus between Scroggins' fraud and the multiple-fire scheme of Jackson and Dancy to show the existence of a "single overall agreement."

The government primarily relies on evidence that sometime in the summer of 1977, Edmunds introduced Morgan to Jackson. The government argues that Edmunds thereby opened up the Scroggins' "conspiracy" to include the activities of Jackson and Dancy occurring thereafter. The fallaciousness of this argument is readily apparent. Morgan testified that the purpose of the introduction was to induce Jackson, acting on behalf of his nonprofit organization, to serve as a tax-exempt conduit for a "donation" of property that Edmunds wished to make to Morgan. Morgan's uncontradicted testimony was that this introduction was unrelated to the arson activities of Scroggins, or of Jackson and Dancy, and that his negotiations with Jackson regarding the 51st Street fire occurred a month or two later. There is no evidence that Scroggins even knew about the Morgan-Jackson introduction, much less that he

fostered it or benefited in some way from their subsequent relationship.

The government also relies on two conversations that Morgan had with Edmunds shortly before the Agnes fire. One week before the fire, Morgan, who had known Edmunds for some time, asked Edmunds whether he had insurance on the Agnes house. Morgan told Edmunds that he had been hired by Scroggins to burn the dwelling. According to Morgan's uncontradicted testimony, Edmunds replied that "he wanted nothing to do with it," but that his interest was insured. Three days before the burning, Morgan asked Edmunds to lend him a ladder so that he could work around the Agnes dwelling and get the neighbors used to seeing him there; Edmunds apparently lent him the ladder.

■ Neither of these conversations raise an inference that a single conspiracy was operating in this case. As to the fact that Edmunds was informed of the intended fraud, it is sufficient to note that "[k]nowledge of the existence or acquiescence in a conspiracy does not serve to render one a part of the conspiracy. There must exist some element of affirmative cooperation or at least an agreement to cooperate." *United States v. Williams,* 604 F.2d 1102, 1118 (8th Cir.1979) (quoting *United States v. Collins,* 552 F.2d 243, 245 (8th Cir.), *cert. denied,* 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977)). Edmunds' alleged loan to Morgan of the ladder might be considered a sufficient "element of affirmative cooperation" to render him part of a conspiracy, but the jury's acquittal of Edmunds leaves that factor a very slender reed for the government to hang on. More importantly, both these conversations at most could give rise to an inference that Edmunds was somehow involved with Scroggins' and Morgan's dealings regarding the Agnes fire. That evidence does not provide what is notably lacking here: proof of some interaction among the participants toward a common goal from which we can infer that a *single* overall agreement unified the parties. *See United States v. Levine, supra,* 546 F.2d at 663–664.

■ Where, as here, a single conspiracy is alleged in the indictment but the proof at trial tended to show that multiple conspiracies were in existence, the error of variance has occurred. *See, e.g., Kotteakos v. United States, supra,* 328 U.S. at 755–756, 66 S.Ct. at 1243; *Berger v. United States,* 295 U.S. 78, 80, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *United States v. Coward,* 630 F.2d 229, 230 (4th Cir.1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 2014, 72 L.Ed.2d 470 (1982); *United States v. Calabro,* 467 F.2d 973, 983 (2d Cir.1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). An accused's rights may be affected in such cases by the introduction of "substantial evidence of crimes unrelated to the defendant." *United States v. Read,* 658 F.2d 1225, 1230 (7th Cir.1981).

■ When the proof at trial reveals the existence of more than one conspiracy, "the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood [that] confusion or prejudice" resulted from transference of guilt from one conspiracy to another. *United States v. Johnson,* 515 F.2d 730, 735 (7th Cir.1975). In *Kotteakos,* the trial court's jury charge was substantially the same as the one given in the present case: the jury was instructed that in order to convict a defendant, he had to be a member of the single conspiracy charged in the indictment and not some other separate conspiracy. The Supreme Court stated that an unfortunate effect of charging the jury that a single conspiracy must be found is that it "prevent[s] the court from giving a precautionary instruction such as would be appropriate, *perhaps required,* in cases where related but separate conspiracies are tried together * * *, namely, that the jury should take care to consider the evidence relating to each conspiracy separately from that relating to each other conspiracy charged." *Kotteakos v. United States, supra,* 328 U.S. at 769–770, 66 S.Ct. at 1250 (emphasis added). The Supreme Court added that the trial court "was careful to caution the jury to consider each defendant's case separately, in determining his participation in 'the scheme'

charged. But this obviously does not, and could not, go to keeping distinct conspiracies distinct[.]" *Id.,* at 770, 66 S.Ct. at 1250.

The Seventh Circuit has adopted the rule suggested by the Supreme Court, holding that

> where, at the close of testimony, it is clear * * * that a jury could not find a single overall conspiracy as a matter of law, the defendant is not only entitled to a multiple conspiracies instruction but also to an instruction that evidence relating to the other conspiracy or conspiracies disclosed may not be used against him under any circumstances.

*United States v. Lindsey,* 602 F.2d 785, 787 (7th Cir.1979); *United States v. Johnson, supra,* 515 F.2d at 733–734 n. 10. *See United States v. Varelli,* 407 F.2d 735, 746–747 (7th Cir.1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). The Ninth Circuit has similarly emphasized the importance of such cautionary instructions. In *United States v. Griffin,* 464 F.2d 1352 (9th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 447, 34 L.Ed.2d 302 (1972), the proof at trial established multiple conspiracies and not the single conspiracy alleged in the indictment. The trial court instructed the jury that if they did not find a single overall conspiracy, they could find the defendant guilty of one of the multiple conspiracies, but only if his guilt was established on the basis of only the evidence relating to the specific conspiracy with which he was involved. The appeals court, in affirming the defendant's conviction, relied heavily on the fact that the cautionary instruction was given, concluding that it "placed a clamp on any possible prejudice which might have seeped from the variance." *Id.* at 1357.

The requirement that juries be specifically instructed, where appropriate, to carefully compartmentalize evidence of separate conspiracies is of particular importance because in most cases where single conspiracies are alleged and multiple conspiracies proven, the conspiracy count provided the only justification for the joinder of multiple defendants in the single trial.[2] *See, e.g., United States v. Coward, supra,* 630 F.2d at 230; *United States v. Cambindo Valencia,* 609 F.2d 603 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Levine, supra,* 546 F.2d at 662–663. Although the courts have ruled that the absence of such a unifying count in the indictment necessitates severance of the misjoined defendants, they have not similarly ruled that when proof of the single conspiracy count fails as a matter of law, the defendants are entitled to severance. *See Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). *But see United States v. Levine, supra,* 546 F.2d at 663 (retroactive misjoinder found when indictment rested on "false legal premise"). *See generally* 8 J. Moore, R. Cipes, *Moore's Federal Practice* ¶ 8.06[3] (2d ed. 1981). Thus, members of separate conspiracies jointly tried must rely on the trial court's exercise of its discretion under Rule 14 to grant a severance when prejudice from the joint trial has been shown.[3] The courts' refusal to recognize "retroactive misjoinder" has occurred despite acknowledgement that "misjoinder of defendants is inherently prejudicial." *United States v. Bledsoe,* 674 F.2d 647, 654 (8th Cir.1982). *Accord United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir.1975), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).[4] Accordingly, the par-

---

**2.** The single conspiracy count in such cases serves as the requisite allegation that the defendants "participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R.Crim.P. 8(b).

**3.** It is unlikely that a defendant will benefit from appellate review of the trial court's refusal to grant Rule 14 severance because "[a]ppellate courts are reluctant to second guess a trial court's refusal to grant a severance." *United*

*States v. Phillips,* 664 F.2d 971, 1017 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). *See United States v. Boyd,* 610 F.2d 521, 525–526 (8th Cir.1979), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980).

**4.** As this Court noted in *United States v. Bledsoe,* 674 F.2d 647, 654 n. 3 (8th Cir.1982),

> [t]he rule against jointly indicting and trying different defendants for unconnected of-

**586**

ticipants in separate, but jointly tried conspiracies should at least be afforded the protection of explicit limiting instructions. And, when such instructions have not been given, this Court on appeal should give heightened scrutiny to the defendants' claim that the jury erroneously "transfer[red] guilt from one to another and [found] defendants guilty of an overall conspiracy." *United States v. Varelli, supra,* 407 F.2d at 747.

At the conclusion of the government's evidence in this case, the court specifically found that for purposes of the admissibility of evidence, one conspiracy existed and all the defendants were members of that conspiracy.[5] Consistent with its conclusion that one conspiracy existed, the court instructed the jurors at the conclusion of the evidence that they were to determine whether a single conspiracy was shown and which defendants were members of that conspiracy. The court did admonish the jury that "proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment," and that each defendant's participation in a single conspiracy must be separately determined. In light of the fact, however, that as a matter of law a single overall conspiracy could not be found on this record, the defendants were entitled to an instruction to that effect. And, if the evidence of the defendants' alleged involvement in separate conspiracies was to be given to that jury at all, the jury should have been explicitly admonished that evidence of Scroggins' wrongdoing was not to be considered when determining the guilt of Jackson and Dancy and, similarly, that Scroggins' guilt was not to be determined with regard to any evidence of Jackson's and Dancy's activities.

In the absence of such instructions, on this record, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error" of variance committed in this case. *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. Accordingly, the conspiracy convictions of Scroggins and Jackson are reversed. They, of course, may be tried again on the conspiracy charges if the government decides to pursue that course of action.

■ There can be little doubt that Scroggins suffered from "unwarranted imputation of guilt from others' conduct." *Id.* at 777, 66 S.Ct. at 1253. The bulk of the trial time was consumed by evidence that Jackson, Dancy and Edmunds had conspired with Morgan to have the 51st, Troost and Indiana properties burned. The government tried to paint a picture of a sophisticated "arson-for-profit" ring, complete with "beeper" phones so that Jackson, Morgan and Dancy could remain in constant contact while planning and executing their criminal activities. And, according to Morgan's testimony, the object of the conspiratorial ring was not limited to the three dwellings listed in the indictment; Jackson, at least, proposed to have three other residences burned.

The government now argues that because there is no evidence linking Scroggins to these post-Agnes fire activities, he could not have been prejudiced by evidence of those activities. The government's efforts at trial, however, were directed at creating a bond, however subtle, between Scroggins

fenses is a long-established procedural safeguard. Its purpose is to prohibit exactly what was done here, namely, allowing evidence in a case against one defendant to be presented in the case against another charged with a completely disassociated offense, with the danger that the jury might feel that the evidence against the one supported the charge against the other. It is not "harmless error" to violate a fundamental procedural rule designed to prevent "mass trials."

(quoting *Ingram v. United States,* 272 F.2d 567, 570–571 (4th Cir.1959)).

5. The court made this ruling pursuant to *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978), which requires that the court expressly determine for the record whether sufficient evidence of a conspiracy exists so that hearsay statements of alleged coconspirators will be admitted under Fed.R.Evid. 801(d)(2)(E).

and others so that Scroggins would be convicted of the single overall conspiracy charged. Under the circumstances, it was not difficult to create such an association in the jurors' minds. Scroggins had known three of his four alleged coconspirators for some time: he had rented the Agnes dwelling from Edmunds for seven years prior to the fire, he had been involved in a "minority training program" run by Morgan, and had known Jackson since 1975. Scroggins' alleged criminal activity was of the same type as alleged against Jackson, Dancy and Edmunds—arson-for-profit at the expense of the insurance companies—and he used the same "torch" as the others—Charles Morgan. "[W]hen, as here, the nexus between the separate groups is the defendants common to each and a mutual identity of the [crimes] charged, the transference of guilt from one group of defendants to the other is inexorable." *United States v. Levine, supra,* 546 F.2d at 662.

The danger that evidence of the other defendants' guilt would be imputed to Scroggins was heightened by the inflammatory nature of much of the evidence presented. Some of the government's more sensational evidence came from JoAnn Murray, who agreed to testify in exchange for the government's withdrawal of the charges against her. Murray testified that for the seven years prior to the Indiana fire, she had been the mistress of Dancy, a prominent Methodist minister who had remained married during this time. The government also introduced evidence that Jackson, who was a Baptist minister, had expressed a cavalier attitude toward the safety of the Troost apartment residents, and further implied that he had tried to murder Charles Morgan.[6] Finally, there was evidence from which the jury could infer that the alleged fraudulent activities of Jackson, Dancy and Edmunds were furthered by the use of Jackson's ostensibly charitable organization, the "Department of Prison Ministries" and by Dancy's standing in the community. Although none of this evidence had the slightest bearing on Scroggins' guilt or innocence, we cannot be sure that its introduction in the joint trial did not prejudice the jury's view of Scroggins' culpability.

We also find that Jackson was prejudiced by the joint trial of the separate conspiracies. Although there was sufficient evidence from which the jury could find that Jackson had conspired with Morgan and others to burn the 51st Street, Troost and Indiana properties, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

The government's proof that Jackson was involved in the second, larger conspiracy revealed at trial rested almost exclusively on the testimony of Charles Morgan. The jury that convicted Jackson apparently did not find Morgan's testimony altogether convincing: although the import of Morgan's testimony was that Jackson, Dancy and Edmunds were each knowingly involved in at least some of the later fires, and the jury was charged that conspirators are responsible for the acts of their coconspirators committed in furtherance of the conspiracy, the jurors acquitted Edmunds and could not reach a verdict as to Dancy. Further, despite the fact that Morgan testified that he set all three of the later fires at the conspirators' behest, only Jackson was convicted of any substantive mail fraud counts resulting from the scheme, and he was only convicted of counts arising out of one of the three fires. In other words, the jury only seemed to believe some of what Morgan had to say.

The jury was obviously persuaded, however, by Morgan's testimony regarding the Agnes fire; that testimony was the only

---

6. Morgan testified that at the time Jackson arranged with him to have the Troost apartment building burned, Jackson informed him that two people were living in the Troost apartments but that he, Jackson, "didn't care if they get out or not." In connection with the Indiana fire, Morgan testified that although Jackson had assured him that the gas was turned off at the Indiana house before Morgan went to "torch" it, the gas was in fact on and Morgan was severely burned in the resulting, unexpectedly intense blaze.

thing linking Scroggins to the "arson ring" and Scroggins was convicted of the conspiracy charge. We cannot say that the strength of this evidence, which would have had no part in a properly conducted trial of Jackson, did not affect the jury's view of the evidence against Jackson, or that it had "but very slight effect." *Kotteakos v. United States, supra,* 328 U.S. at 764, 66 S.Ct. at 1248. *See United States v. Lane,* 584 F.2d 60, 64 (5th Cir.1978).

■ Concededly, there was not as much evidence introduced relating to the Scroggins' scheme as was introduced regarding the other conspirators' activities. But the question of whether a defendant was prejudiced by "transference of guilt across conspiracies' lines" should not be resolved solely on the basis of the quantity of evidence improperly introduced. There was obviously as much risk in Jackson's case as in Scroggins' that because the separate groups engaged in the same type of crimes, and there were defendants common to each, the jury would transfer guilt from one to the other. *See United States v. Levine, supra,* 546 F.2d at 662. And Jackson, as much as Scroggins, was entitled to an explicit instruction that the jury was not to consider the evidence of Scroggins' activities when determining Jackson's guilt or innocence. Under the circumstances, we cannot be sure that Jackson's conspiracy conviction was not substantially affected by the variance between the government's pleading and its proof.

■ In our view, however, this error did not taint the jury's verdict finding Jackson guilty of three substantive mail fraud counts. The courts have recognized that in some cases where a prejudicial variance necessitates reversal of a defendant's conspiracy conviction, the evidence of the defendant's guilt on the substantive charges may be so strong that the substantive convictions must be affirmed. *See United States v. Johnson, supra,* 515 F.2d at 736; *United States v. Varelli, supra,* 407 F.2d at 748. The government adduced very convincing evidence that Jackson had caused three mailings to be made in furtherance of a

scheme to fraudulently obtain insurance proceeds for nonexistent contents of the 51st Street dwelling; his convictions under 18 U.S.C. § 1341 for these mailings will therefore be affirmed.

In contrast to the government's case linking Jackson to the conspiracy as a whole, its evidence that Jackson had caused the three fraudulent mailings did not rest primarily on the testimony of Charles Morgan. As noted previously, Morgan did pin the 51st Street fire on Jackson: he testified that Jackson had "commissioned" the fire, and that Jackson instructed him to get homeowner's insurance on the dwelling in Dancy's name. The government's proof did not end there, however. According to Morgan, he and Jackson had agreed that it would be "a little bonus" if someone could fraudulently collect contents insurance proceeds on the 51st Street dwelling as well. Karen Hicks, whom Jackson procured to do this, took the stand on the government's behalf.

Hicks corroborated Morgan's testimony regarding the 51st Street scheme in every major respect. She testified that Jackson had offered to give her one-half of the proceeds if she would obtain contents insurance on the dwelling by claiming to reside there. Hicks recounted her and Jackson's visits to the house before and after the fire, and their trip to the insurance office to obtain the contents policy. She identified the three documents that were mailed in violation of 18 U.S.C. § 1341: the "property loss worksheet," a list composed by Jackson of personal items supposedly lost by Hicks in the fire, which Jackson mailed after Hicks copied it into her own handwriting; a letter from the insurance agent requesting that Hicks fill out a Proof of Loss form; and the Proof of Loss form, which Jackson filled out and then mailed after he had Hicks sign it. Finally, Hicks related that Jackson had convinced her to lie to the insurance company investigators and to the attorneys who deposed her when the company suspected that the contents claim was fraudulent.

Unlike Morgan, who admitted that he was motivated to testify because he was

angry that Jackson had not paid him for his "work," Hicks had no apparent grudge against Jackson. She was not given immunity or any other promise by the government in return for her testimony. In light of Hicks' testimony, we find that the evidence linking Jackson to the fraudulent contents insurance mailings was so strong that the erroneous introduction of evidence relating to the Agnes fire "did not influence the jury, or had but very slight effect." *Kotteakos v. United States, supra,* 328 U.S. at 764, 66 S.Ct. at 1248.

### Evidentiary Rulings Challenged.

Jackson also challenges a number of the trial court's evidentiary rulings. In light of our holding that Jackson's conspiracy conviction must be reversed, we only need address those allegations of error that may have affected Jackson's substantive mail fraud convictions.

Jackson first contends that the trial court erred in ruling that if Jackson testified in the trial below the government could impeach him with evidence of two prior felony convictions. In February, 1971, Jackson was convicted under 18 U.S.C. § 2314 of knowingly transporting forged securities in interstate commerce. His second conviction which occurred in 1981 was for unlawful possession of a firearm by a felon.

■ Evidence of Jackson's conviction for unlawfully transporting forged securities was clearly admissible for impeachment purposes under Fed.R.Evid. 609(a)(2). Jackson unsuccessfully challenged the admissibility of that conviction in the trial of his firearm charge. As this Court noted on appeal of the firearm conviction, the forged securities crime "encompasses precisely the kind of dishonesty which makes it admissible for impeachment purposes." *United States v. Jackson,* 680 F.2d 561, 564 (8th Cir.1982).

■ Jackson's conviction for unlawfully possessing a firearm was not automatically admissible; evidence of that crime could only be admitted if the trial court determined that "the probative value of admitting this evidence outweighs its prejudicial effect to the defendant." Fed.R.Evid. 609(a)(1). As the defendant notes, the trial court did not make an on-the-record finding that the 609(a)(1) balancing test weighed in favor of admitting the conviction. *See United States v. Bogers,* 635 F.2d 749, 750 (8th Cir.1980); *United States v. Preston,* 608 F.2d 626, 639 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). Although such explicit findings do provide assurance that the trial court complied with Rule 609, their absence in this case does not convince us that the trial court abused its discretion in ruling that the second conviction was admissible. The conviction was very recent; the police discovered the firearm when Jackson was arrested for the incidents charged in the present indictment. Its probative value was further enhanced by the critical role that Jackson's credibility would have played in this case if he had chosen to testify. *See United States v. Spero,* 625 F.2d 779, 782 (8th Cir.1980). The district court properly held that evidence of the firearm conviction could be used for impeachment purposes.

■ Jackson also argues that the trial court erred in permitting the government to cross-examine one of Jackson's witnesses regarding a statement that the witness gave to police at the time of the Troost fire. Robert Powell, who resided in the Troost apartment building when the fire occurred, apparently told the police investigating the fire that he suspected that Jackson was involved. The court allowed the government to briefly question Powell about that prior statement. When Powell denied ever making the statement, and claimed that Jackson could not have been involved in the Troost fire, the court refused to allow the government to read the prior statement into evidence. The trial court did not abuse its discretion in allowing the government's limited attempt at impeaching Powell on this matter. *See United States v. Milham,* 590 F.2d 717, 721 (8th Cir.1979).

■ Finally, Jackson contends that the mail fraud counts of the indictment were

duplicitous because they charged Jackson with both doing a fraudulent act and attempting to do so. This argument is patently meritless. The mail fraud counts of the indictment tracked the language set forth in Form 3, the "model" indictment for mail fraud contained in the Appendix of Forms of the Federal Rules of Criminal Procedure; the mail fraud counts were properly charged.

## III.

### Dancy.

As noted previously, Dancy's conviction was unaffected by the variance between the government's pleading and its proof at the first trial—that jury could not reach a verdict as to Dancy's guilt or innocence and a mistrial was declared. In January, 1982, Dancy was retried on an edited indictment which omitted all reference to Scroggins, Edmunds, and the Agnes and Troost fires. Dancy was convicted on all counts on which he was tried: Count I charged that he had conspired with Morgan, Jackson and Murray to commit mail fraud in connection with the 51st Street and Indiana fires; Count II alleged a fraudulent mailing in regard to the structure insurance on the 51st Street property; Counts III through V related to the contents insurance claim on that dwelling; and Counts VI through VIII charged fraudulent mailings in connection with the Indiana insurance claim.

Dancy raises a myriad of arguments on appeal; we find, however, that no error was committed below that would require reversal of Dancy's convictions.

### Sufficiency of the Evidence.

█ Dancy directly challenges only the sufficiency of the evidence supporting his convictions on Counts VI through VIII, the substantive mail fraud counts resulting from the Indiana fire. We will, however, briefly summarize the evidence connecting Dancy to the allegedly fraudulent scheme as a whole, viewing the evidence, as we must, in the light most favorable to the jury's verdict.

The government's chief witness at Dancy's trial was again Charles Morgan. Morgan testified that he met with Esau Jackson a number of times at Jackson's car wash to complete negotiations on the deal to burn the 51st Street property. Dancy was at the car wash on these occasions. Although Dancy and Morgan did not converse, at each meeting Jackson discussed various aspects of the deal with Morgan, then conferred with Dancy, and then returned to Morgan to firm up the details. Jackson told Morgan that "Reverend Dancy [is] ready to go on this ... on this fire at 51st Street." Jackson explained that the 51st Street property was owned by his Department of Prison Ministries, but that it had been deeded to Dancy in order to assure a quicker insurance payoff; Jackson and Dancy assumed that because of Dancy's prominence in the community, the fire insurance proceeds would be paid promptly without much investigation by the insurance company. Dancy did not want to procure the insurance himself, so Morgan was instructed to obtain a policy on the 51st Street structure in Dancy's name. Jackson provided Morgan with the personal information regarding Dancy that was necessary to fill out the insurance application. Jackson gave Morgan this information at a meeting at which Dancy was present.

The government's evidence also tied Dancy to the procurement of insurance on the nonexistent contents of the 51st Street dwelling. Karen Hicks testified that Jackson solicited her to pose as the tenant of the building, and that Jackson and Dancy drove her to the agent's office to obtain insurance. Dancy remained in the car while Jackson and Hicks met with the agent. When they returned to the car, Jackson told Dancy that the insurance had been obtained and Dancy said, "Okay."

As a result of the 51st Street fire, Dancy received a $20,000 draft from the insurance company; that amount was the maximum that Dancy could claim under the structure insurance policy that Morgan had obtained in Dancy's name. On April 18, 1978, Dancy cashed the draft and with the proceeds

obtained two cashier's checks: a $7,000 check payable to Esau Jackson, and a $1,000 check payable to the Martin Luther King Hospital. Dancy brought the latter check to the hospital and applied it to the bill that Charles Morgan had there. Morgan later received $3,000 in cash from Jackson as the balance of his "fee" for the 51st Street fire; that money came from Dancy.

After the 51st Street property was burned, Morgan and Jackson negotiated the "package deal" which was to include the Indiana fire, and another house owned by Dancy that was never burned.[7] Two days before the Indiana fire, Morgan "met with" Jackson and Dancy. Morgan parked on one side of the street, and Jackson and Dancy on the other. Again, Jackson went back and forth between the two men, negotiating the amount of "front money" that Dancy would have to pay Morgan for materials to burn the Indiana residence. The $450 that Morgan received at that meeting was the last money he was to get; he was not paid his "fee" for the fire. Morgan repeatedly tried to contact both Jackson and Dancy to collect the money. Dancy told Morgan on two occasions that he had paid Jackson all the money for the Indiana fire, and that Morgan should talk to Jackson to collect his fee.

JoAnn Murray had better luck; she received $12,400 as a result of the fire. On July 31, 1978, an independent adjuster sent a letter to American Reserve Insurance Company, the insurer of the Indiana property, recommending that Murray's claim be paid. American Reserve wrote to Murray on August 4, 1978, advising her that her claim was under investigation. On September 26, 1978, the insurer mailed Murray a draft for $12,400 in settlement of her fire loss claim. These mailings were the basis for Dancy's substantive mail fraud convictions resulting from the Indiana fire. The jury could reasonably find that Dancy had "devised * * * [a] scheme or artifice to defraud" the American Reserve Insurance Company of proceeds from the insurance policy on the Indiana dwelling. See 18 U.S.C. § 1341. The evidence at trial revealed that Dancy persuaded Murray to buy the Indiana house and made all the arrangements necessary for her to do so. Dancy was aware that the house was for sale because it was part of the estate of one of his parishioners, and he had been made executor of the estate. Dancy gave Murray at least $1,775 of the $1,875 purchase price. He said she should have insurance on the dwelling, and told her to go to the Gallery Insurance Company to get it; Morgan had suggested that company to Jackson because he knew that other companies would not insure homes in the "high-risk" area that the Indiana house was in. Two or three weeks after insurance on the dwelling was issued, Morgan, at Dancy's behest, burned it to the ground, and Murray collected proceeds representing over six times the amount she had paid for the dwelling.

Dancy himself never received any of the proceeds; Murray, who was apparently unaware of the scheme, used the money to set up housekeeping with her new husband, whom she married six months after the fire.[8] However, "[i]t is not necessary in a mail fraud prosecution to show that a defendant profited from his scheme." *De-Mier v. United States*, 616 F.2d 366, 369 (8th Cir.1980). *Accord United States v. Bassler*, 651 F.2d 600, 604 (8th Cir.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1018,

7. The evidence that the 51st Street and Indiana arson deals were separately negotiated does not, as Dancy contends, establish that two conspiracies, and not a single one, were at work. The "[p]erformance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.'" *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). The government's proof at Dancy's trial revealed the kind of unity of purpose and mutual dependence and assistance among the alleged coconspirators that was notably lacking in the first trial.

8. Murray gave Dancy a $2,500 check out of the insurance proceeds. Her uncontradicted testimony, however, was that the money was reimbursement for a ring that Dancy previously had given her. Murray's husband would not allow her to keep the ring, which was appraised at $3,000, unless she paid Dancy for it.

71 L.Ed.2d 305 (1982). Despite Dancy's failure to directly benefit from the Indiana arson fire, the jury could infer that his conduct was actuated by a specific intent to defraud the insurer. *DeMier v. United States, supra,* 616 F.2d at 369.

The jury could also reasonably find that Dancy "knowingly caused" the three mailings to be made "for the purpose of executing such scheme or artifice or attempting to do so." 18 U.S.C. § 1341. Dancy argues that causation was not shown because he neither mailed the subject letters himself, nor was directly involved in the claims process that prompted the letters. Murray testified that Dancy did not tell her to file a claim after the fire, and in no way assisted her in doing so. That circumstance does not, however, remove Dancy's actions from the purview of the mail fraud statute.

■ If the subject mailings emanated from a nondefendant, the defendant will be held to have caused the mailings if they were the "reasonably foreseeable result of his actions." *United States v. Cooper,* 596 F.2d 327, 330 (8th Cir.1979); *United States v. Brown,* 540 F.2d 364, 376 (8th Cir.1976). Dancy obviously could have foreseen that if Murray's insured property was destroyed by fire pursuant to his direction, Murray would file a claim for that loss. The Indiana insurer testified that it was not even necessary for Murray to instigate the claim herself; the company automatically investigates losses if it is advised by the police, or fire department personnel or by anyone that a fire has occurred on an insured's property. Dancy also could foresee that that claims process would involve the use of the mails. Dancy sold insurance himself, and must have known that the use of the mails in submitting claims and receiving payment for insurance losses is an expected occurrence.

Furthermore, the mailings were clearly made in furtherance of Dancy's scheme to defraud. *See United States v. Tackett,* 646 F.2d 1240, 1244 (8th Cir.1981). That scheme did not reach fruition at least until Murray received the last count letter, which contained the fire insurance proceeds. *See*

*United States v. Cooper, supra,* 596 F.2d at 329. All three mailings "played a significant part in enabling [Murray] * * * to acquire dominion over" the money that Dancy fraudulently intended her to receive. *United States v. Maze,* 414 U.S. 395, 401, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974).

### Conduct of the Trial.

Dancy argues that his trial was marred by a number of erroneous rulings, starting with those relating to voir dire and ending with the instructions given to the jury. These contentions are without merit.

■ Dancy, who is black, first contends that he was denied a fair trial because the trial court permitted "unfettered government peremptory strikes of black jurors." This allegation is of concern because of the frequency with which we have been called upon to examine the prosecutor's practices in this regard in the Western District of Missouri. *See, e.g., United States v. Greene,* 626 F.2d 75 (8th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 220, 66 L.Ed.2d 98 (1980); *United States v. Boyd,* 610 F.2d 521, 526 (8th Cir.1979), *cert. denied* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Aaron,* 553 F.2d 43, 44 (8th Cir.1977); *United States v. Nelson,* 529 F.2d 40, 42–43 (8th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976); *United States v. Carter,* 528 F.2d 844, 847–850 (8th Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976). As we have noted, that office's practices raise a "serious question" because its prosecutors "very often strike all or most black persons from serving on juries hearing criminal cases of black defendants." *United States v. Nelson, supra,* 529 F.2d at 43.

We have previously suggested that the potential for racially motivated misuse of the government's peremptory challenges might be minimized if the trial court exercises its "supervisory powers over the trial of criminal cases * * * [by requiring] the prosecutor to discharge his duties in a fair, even, and constitutional manner, and thus ensure that no potential juror is denied the

privilege of serving upon a jury solely because of his race." *Id.* It is apparent that the trial court did so here.

Prior to Dancy's trial, the court issued an order granting the defendant's motion "to prevent the use of peremptory challenges by the prosecution to strike black or other minority members from the jury * * * unless the government can show good reason why a black or other minority member should be stricken from the jury panel." [9] At trial, the court carefully questioned the government as to each peremptory strike exercised against a black venireman. As a result, the record clearly shows that the government did not exercise its challenges improperly.

The government peremptorily struck six persons from the jury panel: three whites and three blacks. It also struck one black person from the alternate panel. One black person served as a juror, and one black served as an alternate. The government had sufficient peremptory challenges to eliminate all black persons from the jury, but chose not to do so. The government's rationale behind its challenges was particularly clear in the case of venireman Arrington Klice. Klice stated on voir dire that he had known Dancy for the past three years in connection with various civic projects they were both engaged in. Furthermore, Klice was acquainted with six of the seven character witnesses that Dancy planned to call, and a number of these witnesses were long-time friends of Klice. Ruthy Sanders, another black person peremptorily struck, was acquainted with one of the defendant's character witnesses and was familiar with the case from newspaper accounts. Carrie Mays, the third black venireman struck, had also read newspaper accounts of the previous trial. Under the circumstances, there is no support for defendant's contention that the prosecutor has "perverted the purposes of the peremptory challenge." *United States v. Carter, supra,* 528 F.2d at 849.

Dancy next argues that he was denied a fair trial because the trial judge improperly cross-examined certain witnesses. This argument is without merit.

Rule 614(b) of the Federal Rules of Evidence expressly allows the trial court to interrogate witnesses. In so doing, the court must, of course, exercise great care "to avoid the appearance of advocacy for a particular party." *United States v. Nelson,* 570 F.2d 258, 262 (8th Cir.1978). The record reflects that in fact the trial court did not become an advocate for either party, but rather, fulfilled its duty to "make the interrogation of witnesses and presentation of evidence effective for the ascertainment of truth." *United States v. Cooper, supra,* 596 F.2d at 330.

Dancy most vigorously complains of the trial court's questions to him regarding the checks he wrote to Jackson as alleged payments on the $20,000 purchase price of the 51st Street house. Dancy contended at trial that he had paid Jackson $13,000 by the time of the fire, and that the $7,000 check from the proceeds was not Jackson's "pay-off," but rather, was the balance of the purchase price. We find that the court's brief interrogation of Dancy merely served to clarify the somewhat confusing testimony that Dancy had given on this point. The court also briefly questioned Donald Price, the senior claims representative responsible for evaluating the 51st Street structure loss claim, as to whether Dancy had expressed surprise that

---

9. At the same time, the court denied defendant's motion to allow discovery regarding the "past frequency of such challenges" and the existence vel non of "written and unwritten policies concerning prosecution challenges of black jurors." Although the reason for the court's denial of this motion is not apparent, we do not find that the ruling is reversible error. Because as we note, *infra,* the defendant did not even show that blacks were "systematically" excluded from his own jury, we fail to see how discovery would have enabled him to prove "that the prosecutor is 'in case after case, whatever the circumstances, whatever the crime and whoever the defendant or victim may be' peremptorily striking blacks from service on petit juries." *United States v. Carter,* 528 F.2d 844, 850 (8th Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976) (quoting *Swain v. Alabama,* 380 U.S. 202, 223, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965)).

insurance had been procured in his name. This interrogation of the government's witness could not have prejudiced the appellant because Dancy contended that he had given Jackson permission to obtain the insurance, but not for the reason claimed by the government. Furthermore, the court carefully instructed the jury at the conclusion of trial that its questioning did not indicate that the court held an opinion as to the related matters. There is simply no indication that the trial court's very limited involvement in the presentation of evidence was at the expense of its necessary appearance of impartiality.

Dancy also contends that the trial court erred in limiting the number of character witnesses he could present, and in allowing the government to cross-examine those witnesses regarding Dancy's affair with Murray. This contention is frivolous. In the first trial, the court allowed Dancy to present seven character witnesses; at the second trial, he was allowed to present four and, additionally, read the testimony of two others given at the first trial. The government was allowed to briefly inquire of the four "live" witnesses whether they had known of the long-standing Dancy-Murray affair prior to the trial and whether, if they had known of it, their opinion as to Dancy's character for truthfulness would be different. All four witnesses answered "no" to both inquiries. The trial court's rulings regarding Dancy's character witnesses were not an abuse of its discretion. See Fed.R. Evid. 608.

We have carefully considered the balance of Dancy's allegations of error, and find them to be without merit. The court's evidentiary rulings were within its discretion and its instructions to the jury, viewed as a whole, adequately stated the relevant legal principles. See United States v. Brown, 584 F.2d 252, 259 (8th Cir.1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979). Dancy's conspiracy and mail fraud convictions are affirmed.