UNITED STATES of America, Appellee,

v.

Kerry NEVILS, Appellant.

UNITED STATES of America, Appellee,

v.

Terry DUMAS, Appellant.

UNITED STATES of America, Appellee,

v.

Henry DUMAS, Appellant.

UNITED STATES of America, Appellee,

v.

Kenneth BRADDOCK, Appellant.

UNITED STATES of America, Appellee,

v.

William L. TANNER, Appellant.

Nos. 88–2877, 88–2878, 89–1021, 89–1093 and 89–1105.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1989.

Decided Jan. 31, 1990.

Rehearing Denied in No. 89–1093 March 19, 1990.

Robert J. Golterman, St. Louis, Mo., for appellant, Kerry Nevils.

Kevin Barry, St. Louis, Mo., for appellant, Terry Dumas.

Phyllis A. Radovich, St. Louis, Mo., for appellant, Henry Dumas.

William Laird Hetlage, St. Louis, Mo., for appellant, Kenneth Braddock.

Steven E. Holtshouser of St. Louis, Mo., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and HEANEY, Senior Circuit Judge.

HEANEY, Senior Circuit Judge.

Appellants were convicted of various offenses, including conspiracy to distribute heroin and cocaine. They raise numerous issues on appeal. After reviewing the record, we find no errors which justify a reversal. We affirm.

## I.

William Tanner was a bail bondsman and drug dealer living in Los Angeles. Locha Davis moved from St. Louis to Los Angeles, where she met Tanner. According to her testimony, during a visit to St. Louis in January 1985, Terry Dumas, frequently referred to as "T," asked her if she could find him a source for heroin in Los Angeles. She contacted Tanner and served as an intermediary person for the shipping of heroin and cocaine to St. Louis. The narcotics were mailed by Davis or Tanner from Los Angeles to various homes in St. Louis, including: the home of Jackie Coleman, a friend of Davis; the home of Robert Cash, also a friend of Davis; and another residence which served as the part-time home of Kerry Nevils. Davis paid the recipients to receive the packages.

Coleman testified that at least twice packages were picked up by Terry Dumas and Alfreda Nevils Dumas, his wife. Coleman testified that on at least one other occasion, a package was picked up by Davis, accompanied by Terry Dumas, Kenneth Braddock, and Henry Dumas. On another occasion, Henry Dumas accompanied Davis to pick up a package.

Tanner was paid by Western Union wire shortly after each delivery. The named senders included Alfreda Nevils Dumas, Henry Dumas, Terry Dumas, and Kerry Nevils. The recipients were William Tanner and Locha Davis. A total of $178,000 was sent by persons in St. Louis associated with this matter to Tanner or Davis in Los Angeles, from March 2, 1985 through January 11, 1986.

The St. Louis Metropolitan police began investigating the St. Louis defendants in June 1985. A pen register was placed on Terry Dumas' phone. According to the affidavit of Detective Fredericksen, on October 17, 1985, an informant told him that Kenneth Braddock and Terry Dumas were expecting a shipment of heroin and cocaine on that very day, and indicated that the shipment would be cut at an apartment on Laclede Street and distributed to dealers at a particular hotel. On that day, Terry Dumas, Kenneth Braddock and Davis were observed entering the Laclede apartment. Terry Dumas left and proceeded to the hotel. Shortly thereafter, Detective Fredericksen composed the aforementioned affidavit and obtained search warrants for the two locations. During this time, other officers continued the surveillance. Terry Dumas left the hotel and drove in a manner that indicated to the officers that he was aware of their surveillance. The car he was driving contained a phone. While awaiting the issuance of a warrant, police officers detained him to eliminate the possibility that he would contact the individuals at the apartment.

The first search warrant was executed at the hotel. A now deceased individual was arrested in the bathroom. Two partially filled capsules of heroin were found near the toilet. The hotel room was rented to Henry Dumas. A key to the hotel room was later found in Terry Dumas' effects, seized when he was detained.

The second search warrant was executed at the Laclede apartment. Inside, the police found Kerry Nevils, Locha Davis, Henry Dumas, and Kenneth Braddock. Kerry Nevils attempted to close the door on the police. He later indicated that he often lived at that apartment. Kenneth Braddock was found kneeling in a hallway over a suitcase that contained nearly 450 capsules of heroin, 42 boxes of Dormin (a cutting agent), sifters, strainers, a scale, and a grinder. There were nearly 500 capsules of heroin in the living room. The bedroom contained a bottle of P.C.P., 100 capsules of heroin, a ball of uncut heroin, and some cocaine.

The police discovered the use of the postal service and Western Union for delivery and payment.[1] Toll records showed repeated calls to Tanner's residences in Los Angeles. The St. Louis police learned that Tanner was the subject of a Drug Enforcement Agency (D.E.A.) investigation in Los Angeles.

After the searches and arrests, the St. Louis investigation continued. A heroin package was seized en route to Coleman's house. The return address was a fictitious location in Los Angeles. A search warrant was obtained and the majority of the heroin was removed from the package. A tracking device was inserted. On January 29, 1986, in conjunction with the postal service, the police executed a controlled delivery of the package. Robert Cash and another person picked up the package from Coleman's house and tripped the alarm on the package. They were arrested.

At trial, the prosecution introduced evidence regarding Tanner's activities in California and other evidence regarding the St. Louis conspirators. Brenda LaMotte, a D.E.A. agent from Los Angeles, testified that she was introduced to Tanner by a paid informant and had seven contacts with him from June 5, 1985 through February 11, 1986. During this time, she received heroin and cocaine from Tanner. On two of the seven occasions, he made reference to activities in St. Louis. During the second meeting, Tanner referred to his shipments of narcotics to St. Louis to explain why he was short of drugs. According to LaMotte, this statement was made on June 14, 1985, approximately the same time as the St. Louis investigation began. During the fifth meeting, on January 22, 1986, Tanner indicated that his distribution network ran to St. Louis.

Joanne Freeman was the informant who introduced LaMotte and Tanner. Freeman testified that while in Tanner's apartment, she observed Tanner preparing a package of heroin and cocaine. The delivery address was Jackie Coleman's residence. On another occasion, at Tanner's request, Freeman drove Tanner to the Western Union office to pick up money. Freeman also lent Tanner money. She testified that Tanner once told her he could not repay her because "T" had been busted in St. Louis. In a separate legal proceeding resulting from the D.E.A. investigation, Tanner pled guilty to conspiracy to distribute heroin in California.

In addition, the prosecution introduced evidence that Henry Dumas had rented 12 beepers from December 1984 through 1985, despite his resignation in December 1984 from his past work at Honeywell Corporation. Henry Dumas told the beeper representative that he was starting a company. He told his Honeywell supervisor that he was returning to college. Other witnesses testified regarding the extent and timing of calls between the beepers, two cellular phones and various household phones belonging to the defendants. The prosecution urged that the beepers were used in furtherance of the conspiracy. When the search warrant was executed at the Laclede apartment, Henry Dumas, Kenneth

---

**1.** These records indicate that no shipments were delivered between October 12 and October 28, 1985. On appeal, no appellant challenges the validity of the search warrants.

Braddock, and Kerry Nevils were all wearing beepers rented by Henry Dumas.

William Tanner, Locha Davis, Henry Dumas, Terry Dumas, Kenneth Braddock, Alfreda Nevils Dumas, Robert Cash, Clinton Nevils, and Kerry Nevils were charged in Count I of the indictment with conspiracy to distribute heroin and cocaine. Jackie Coleman and Joanne Freeman were listed as unindicted co-conspirators. Counts II through VIII were directed at William Tanner and concerned his use of interstate facilities. Count IX charged that Locha Davis, Henry Dumas, Kenneth Braddock, and Kerry Nevils possessed heroin and P.C.P. with intent to distribute. Count X charged Robert Cash with possession of heroin with intent to distribute.

Locha Davis, Clinton Nevils, Alfreda Nevils, and Robert Cash pled guilty to Count I, conspiracy to distribute cocaine and heroin. Locha Davis was dismissed from Count IX, and Count X against Cash was dismissed. The remaining defendants went to trial. They called no witnesses. In general, counsel for each argued that the evidence was insufficient and that Locha Davis and Jackie Coleman were lying. All were convicted of Count I. Terry Dumas received a sentence of fourteen years. William Tanner was also convicted of Counts II, IV, V, VI, VII and VIII. He was sentenced to twenty-five years in jail. Henry Dumas was acquitted on Count IX. He received a sentence of five years on Count I. Kenneth Braddock and Kerry Nevils were convicted on Count IX. They received sentences of twelve and seven years, respectively.

## II.

 On appeal, the defendants collectively raise fourteen issues. Four issues present substantial questions of law: whether the defendants were entitled to severance; whether the defendants were entitled to a jury instruction regarding multiple conspiracies; whether the statements of co-conspirators were erroneously admitted; and whether Terry Dumas was unlawfully detained. In addition, we consider whether this prosecution violated Tanner's plea agreement in California. The remaining issues are without merit.[2]

**2.** Kenneth Braddock appeals from the failure of the court to order a Bill of Particulars, the admission of testimony regarding a large jewelry purchase for cash and the admission of Jackie Coleman's identification in court. Braddock also argues that he was the victim of pre-indictment delay. After reviewing the record, we reject these claims as unfounded.

Kerry Nevils argues that there was insufficient evidence to support his conviction. We agree that mere presence in the apartment is not enough to prove that he was part of any conspiracy. *United States v. Graham,* 548 F.2d 1302, 1312 (8th Cir.1977). The evidence discloses, however, that he was listed as the sender of two Western Union money transfers to Los Angeles—one to Locha Davis and one to Tanner. Detective Fredericksen testified that Kerry Nevils attempted to slam the door in the officers' faces when they served the warrant. He was wearing one of the beepers rented by Henry Dumas. We believe that the jury could infer that he was part of the conspiracy. In addition, Kerry Nevils objects to the length of the sentence imposed for Count IX, possession with the intent to distribute heroin and P.C.P. He argues that without a special verdict, it is impossible to know for which substance he was adjudged guilty. His sentence exceeds the maximum sentence allowed by statute for P.C.P. alone. *Cf. United States v. Alvarez,* 735 F.2d 461 (11th

Cir.1984) (similar problem). We disagree with Nevils' claim because the district court repeatedly instructed the jury that Count IX involved both heroin and P.C.P. Trial Transcript, Vol. VI, at 152–56. Thus, to convict him on this count, the jury would have had to have found that he possessed both drugs with intent to distribute. The evidence seized at the apartment and the testimony of Locha Davis and the arresting officers are more than sufficient to support this conclusion.

Nevils and Braddock challenge the admission of evidence gained from pen registers placed by court order on the phones of Alfreda Dumas, Terry Dumas and Locha Davis. They acknowledge that pen registers which only record numbers dialed are not searches and seizures within the meaning of the fourth amendment. *Smith v. Maryland,* 442 U.S. 736, 742–44 (1979). They argue that, nevertheless, evidence that other members of the conspiracy called them should be inadmissible without search warrants for the phones called. There is no merit to this because pen registers are not searches and do not record the contents of the phone calls. *Smith v. Maryland,* 442 U.S. at 741.

Finally, Henry Dumas and Terry Dumas challenge the impartiality of the jury. They allege that one juror was observed listening to defense counsel preparing for Davis's cross-examination. Terry Dumas alleges that one juror saw

## A.

Kerry Nevils, William Tanner, Kenneth Braddock, and Terry Dumas appeal the district court's denial of their motions to sever. They argue that joinder of their cases affected their ability to call co-defendants as witnesses, and they argue that evidence specific to other members of the conspiracy "spilled over" such that the jury was unable to make a separate assessment of guilt with respect to each. In particular, Kenneth Braddock and Kerry Nevils argue that the defense of each person in the apartment to Count IX is that another person in the apartment must have possessed the heroin and P.C.P.

The Federal Rules of Criminal Procedure provide for the joinder of defendants when "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Severance is proper where joinder would cause prejudice to the rights of a defendant. Fed.R.Crim.P. 14. Whether or not prejudice occurs principally depends on whether the jury could compartmentalize the evidence against each defendant. *United States v. Lueth,* 807 F.2d 719, 731 (8th Cir.1986). Delicate judgments about the nature of the evidence are originally matters for the trial court. We will reverse a decision not to sever, however, where our review of the record convinces us that the trial court's assessment of the prejudice present was clearly wrong. *See id.* at 730–31; *accord United States v. Sweeney,* 817 F.2d 1323, 1325 (8th Cir.),

*cert. denied,* 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 141 (1987).

■ We do not believe that the jury was unable to compartmentalize the evidence. The verdict on Count IX speaks for itself; Henry Dumas was acquitted and Nevils and Braddock were found guilty. The jury was clearly able to separate the conduct of each. Braddock was found kneeling over the suitcase filled with narcotics and processing equipment. Nevils attempted to obstruct the police, was wearing a beeper furnished to other members of the conspiracy, and sent two of the money transfers. Henry Dumas was present in the apartment, but the evidence does not indicate that he made physical movements in close proximity to the heroin, narcotics equipment, or the P.C.P. in the bedroom. With respect to Count I, the evidence clearly indicates that all the defendants were engaged in a conspiracy. The jury's decision to convict all the defendants on this Count merely reflects that specific facts about each were admitted. We find no harmful prejudice.

Nor do we believe that joinder prevented any defendant from presenting exculpatory testimony. Error occurs when the defendant can show that a co-defendant would have testified and that testimony would have been exculpatory. *Sweeney,* 817 F.2d at 1326. No defendant's claim can satisfy this standard.[3]

## B.

All the defendants challenge the failure of the trial court to give a multiple conspir-

---

him in handcuffs in the hall. Both matters were satisfactorily probed by the district court. The first juror may have only opened the door to the court and quickly closed it. The second likely did not see the handcuffs. Neither claim is strong enough to justify a reversal.

3. Tanner argues that he was prevented from calling other defendants who would have testified that they were unaware of his involvement. We do not believe that this prospective testimony would have been sufficiently exculpatory. The prosecution argued that Tanner shipped narcotics to St. Louis which were received by Locha Davis or at her direction. He was convicted of conspiracy to distribute narcotics and of the criminal use of interstate facilities. That some members of the St. Louis distribution net-

work did not know him is of minimal significance. Terry Dumas' claim also fails. Dumas repeats his pretrial argument that Robert Cash would testify that Cash did not know Terry Dumas. Cash, however, pled guilty before trial, so Terry Dumas could have called him as a witness. Terry Dumas also argues that Kerry Nevils grand jury testimony indicates that Nevils could have provided exculpatory testimony. A transcript of this testimony was not made part of the record nor were we able to obtain it from counsel. In case counsel was confused, we reviewed the grand jury testimony of Clinton Nevils, which appears to be similar in content to the representations of Kerry Nevils' testimony. Clinton Nevils, however, pled guilty before trial and could have been called.

acy instruction to the jury. They argue that while the indictment charged a single conspiracy, the evidence at trial showed that there could have been as many as three conspiracies. They argue that the jury could have found that there was one conspiracy to distribute drugs between Locha Davis and William Tanner, one conspiracy to distribute drugs between Locha Davis and Terry Dumas, and another conspiracy to distribute drugs between Locha Davis and Robert Cash.

■ The trial court denied the defendants' request for an instruction which noted that the defendants contended that other conspiracies existed, and told the jury that they must find each defendant guilty of the particular conspiracy charged in the indictment.[4] The instructions given by the district court required that the jury find that each defendant was a member of the conspiracy charged in the indictment and that at least one of the overt acts charged in the indictment was committed by one of the conspirators in furtherance of the conspiracy. Trial Transcript, Vol. VI, at 144–48. Further, the jury was instructed to consider the evidence regarding each defendant and each defendant's acts and statements separately in determining whether each defendant was a member of the conspiracy charged in the indictment. *Id.* at 147. The district court, however, failed to specifically relate these instructions to the testimony or to the defense theories to illustrate what the jury could infer. We agree that a multiple conspiracy instruction of the type requested was required, but do not find substantial prejudice to any defendant by the failure to give one.

The facts may prove a single conspiracy where the defendants have a common purpose. There must be mutual dependence or assistance, or each defendant must have some awareness of the nature and scope of the conspiracy and have joined in the conspiracy willingly. *United States v. Jackson,* 696 F.2d 578, 582–83 (8th Cir.1982),

*cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). A defendant need not have known every other conspirator. *United States v. Massa,* 740 F.2d 629, 636 (8th Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). The existence of common actions, however, does not prove that all the events under consideration were part of a single conspiracy. *United States v. Snider,* 720 F.2d 985, 988 (8th Cir.1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984). The difficult task of distinguishing between single and multiple conspiracies is the province of the jury. *United States v. Zimmerman,* 832 F.2d 454, 457 (8th Cir. 1987) (per curiam). Where the evidence can support a finding of multiple conspiracies, a multiple conspiracy instruction must be given. *United States v. Townsley,* 843 F.2d 1070, 1082 (8th Cir.), *reheard en banc on other grounds,* 856 F.2d 1189 (8th Cir. 1988)); *cf.* Wright, *Federal Practice and Procedure: Criminal 2d* § 482 (1982).

The defendants urge that the evidence could show two conspiracies not charged in the indictment. First, there might have been a separate agreement between Locha Davis and William Tanner. Joanne Freeman testified that she visited other cities on Tanner's behalf to sell drugs. Trial Transcript, Vol. II, at 86–89. Kerry Nevils argues that because Locha Davis also traveled frequently from Los Angeles, although there was no testimony that she sold drugs for Tanner in other cities, the jury could infer that she did. Second, they argue Davis' dealings with Robert Cash were not part of the conspiracy charged. Locha Davis testified that she would give drugs to Cash, who in turn would distribute them to others. *Id.* at 144–46. She also indicated that her dealings with Cash were "separate." *Id.* at 185. We do not believe there is any merit to the first claim. As Nevils concedes, there is no testimony that Davis distributed drugs in cities other than St. Louis. While Joanne Freeman may have done so, this is insufficient to

---

**4.** The instruction was a modified version of 2 Devitt & Blackmar *Federal Jury Practice and* *Instructions* § 27.16 (1977).

support an inference that Locha Davis acted similarly.

The testimony of Locha Davis, however, is sufficient to put at issue the existence of a second conspiracy involving Robert Cash. She testified that she gave Cash heroin at cost because he was a friend. *Id.* at 184. She indicated that her "agreement" with Cash was separate from the other events discussed in her testimony, and said with respect to the other defendants and Cash, "... no, they were not friends or were affiliated in any type of way." *Id.* at 185. The controlled delivery of heroin picked up by Cash and discussed at trial thus may have been separate from the actions of most of the other defendants.[5]

The trial court thus erred in failing to give a multiple conspiracy instruction. In sorting through the facts, the jury must be told to keep the evidence of distinct conspiracies separate; it does not suffice to tell the jury merely to distinguish between defendants. *Kotteakos v. United States,* 328 U.S. 750, 769–70, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946); *Jackson,* 696 F.2d at 584–85. A jury can all too easily aggregate evidence which should be kept separate, transferring guilt from one defendant to another. *United States v. Lindsey,* 602 F.2d 785, 787 (7th Cir.1979). Moreover, the giving of this instruction where warranted is vital to the fairness of a conspiracy trial because we often display a reluctance to overturn convictions for failure to sever defendants. *Jackson,* 696 F.2d at 585 n. 3.

If the failure of the trial court to give a multiple conspiracy instruction results in substantial prejudice to any defendant, we will reverse his conviction. *See Kotteakos,* 328 U.S. at 752, 66 S.Ct. at 1241–42 n. 3. We must be able to say with "fair assurance" that the error did not sway the jury's verdict. *See id.* at 765, 66 S.Ct. at 1248. In this case, we can say that the testimony regarding Robert Cash and the controlled delivery was of inconsequential effect. First, the testimony was cumulative. Tes-

timony regarding the controlled delivery only proved that the Express Mail packages contained drugs, preventing any defendant from claiming that they contained dirty socks. The testimony of Brenda LaMotte, who saw the packages made up in Los Angeles, and that of Locha Davis had the same effect. Second, all the other evidence clearly shows that all the defendants were part of the conspiracy charged in Count I of the Indictment.

### C.

Kerry Nevils, Kenneth Braddock, and Terry Dumas each challenge the admission of certain co-conspirator statements. Brenda LaMotte, Joanne Freeman, and Locha Davis each testified that Tanner made statements regarding his shipments to St. Louis. Other witnesses repeated statements made by Terry Dumas regarding obtaining bail for "my people" and seeing that they reported to the authorities. The trial court admitted the statements conditioned on the prosecution's ability to prove by a preponderance of the evidence the following prerequisites for admission: (1) that a conspiracy existed; (2) that the declarant and defendant were members of the conspiracy; and (3) that the declaration was made during the pendency and in furtherance of the conspiracy. *United States v. Norton,* 846 F.2d 521, 525 (8th Cir.1988); *See* Fed.R. of Evid. 801(d)(2)(E) (co-conspirator statements are not hearsay); *United States v. American Grain & Related Indus.,* 763 F.2d 312, 319–20 (8th Cir.1985) (problems of conditional admission). All three defendants argue that there was insufficient independent evidence that they were part of a conspiracy. Nevils argues that some statements were not made during or in furtherance of the conspiracy. We disagree.

First, we believe that there was sufficient evidence that these three defendants and William Tanner were all co-conspirators. The Express Mail and Western Un-

---

5. In any event, this claim is of no help to William Tanner, who supplied all the drugs that were mailed to St. Louis. Even if the jury found that Davis and Cash acted separately

from the other St. Louis conspirators, Tanner was still the supplier. *Cf. Zimmerman,* 832 F.2d at 457 n. 2.

ion receipts, together with Locha Davis' testimony, linked Tanner to the St. Louis operation run by Terry Dumas. Locha Davis identified Terry Dumas and Braddock as members of the conspiracy. Nevils attempted to close the door on the police when they searched the apartment and was listed as the sender of two money transfers. Braddock was found kneeling over the heroin-filled suitcase. Terry Dumas had been at the apartment and had later visited the hotel where drugs were also found. Locha Davis implicated Terry Dumas as the ring leader. We believe that the evidence produced at trial, apart from the challenged statements, was sufficient to establish that these defendants were part of a conspiracy.

Second, the statements admitted were made during the course of the conspiracy and in furtherance thereof. Tanner's statements identified other conspirators in St. Louis. He made reference to his St. Louis dealings to explain why he did not have drugs in Los Angeles and could not repay money he had used to purchase drugs and run his operation. *See United States v. Williams*, 604 F.2d 1102, 1113 (8th Cir.1979) (statements identifying a co-conspirator are usually in furtherance of the conspiracy); *see also United States v. Jackson*, 549 F.2d 517, 533–34 (8th Cir.), (contours of "in furtherance" requirement), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); 431 U.S. 968, 97 S.Ct. 2928, 53 L.Ed.2d 1064 (1977); 431 U.S. 923, 97 S.Ct. 2195, 53 L.Ed.2d 236 (1977). Terry Dumas' statements did not name any other person and thus did not incriminate any other defendant.

### D.

▮ Terry Dumas was detained for an hour and a half by the St. Louis Police at a police station while the police obtained search warrants for the Laclede apartment and the hotel room. The police detained him to prevent him from calling the apartment to tell persons there that he was being followed. After the search warrants were executed, Terry Dumas was placed under arrest and was read his *Miranda* rights. No arrest warrant was ever obtained. Terry Dumas argues that his seizure was illegal. We disagree.

The magistrate found that the detention was lawful for two reasons: Terry Dumas might have tipped off others at the apartment that the police were closing in and his "initial detention was temporary and the police thereafter proceeded expeditiously with their investigation. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)." Report and Recommendation at 12 (May 18, 1988). We find both reasons lacking, but hold that the detention was lawful because there was probable cause to arrest him.

The police may, on reasonable suspicion, briefly detain individuals to investigate criminal activity. *Florida v. Royer*, 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983) (plurality); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The police must have probable cause to believe that an individual is involved in criminal activity before detaining him in custody beyond the time necessary for a limited investigation. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). In *Dunaway*, the defendant was taken to a police station and subjected to questioning for less than an hour before he confessed. The Court found that the treatment of the defendant was "indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." *Id.* In contrast, in the case relied on by the magistrate, *Sharpe*, the defendant was detained by the side of the road for twenty minutes pending the arrival of a federal agent. The Court found the detention reasonable under the circumstances. *Sharpe* rejected a bright-line time limit on investigative stops. The duration of the stop, however, continues to be important in deciding whether the police have exceeded their authority; the validity of each stop is judged against the specific investigatory purposes of the stop and the "time reason-

ably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1574.

In this case, we cannot say that the stop of Terry Dumas was for an investigation. He was detained for the express purpose of rendering him immobile. Moreover, he was unwillingly removed to a police station and held there for an extended period of time without being questioned. His detention cannot be justified as a *Terry* stop. We are also unable to justify his detention solely because the police believed that there were exigent circumstances. Exigent circumstances can justify the warrantless seizure of a person only when there is already probable cause to arrest. *United States v. Palumbo*, 735 F.2d 1095, 1097 (8th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984); *see also United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (warrantless arrest permissible in limited circumstances).

We reject Terry Dumas' claim only because we believe that there was probable cause to arrest him at the time he was detained. The affidavit attached to the search warrant reveals that an allegedly reliable informant had told the police that Terry Dumas and Kenneth Braddock would receive a heroin shipment on that day and that they would cut the shipment at the Laclede apartment and deliver some of it to that particular hotel. The police observed Terry Dumas and Kenneth Braddock go to the apartment and subsequently observed Terry Dumas drive to the hotel. He was detained after leaving the hotel. There was probable cause to arrest him at that time. There were no statements admitted at trial made after his detention and before he was read his *Miranda* rights.

### E.

Finally, we consider whether there was any overlap between the California prosecution of Tanner and this prosecution. The California indictment reveals that Tanner and two other men were principally charged with selling heroin to undercover agents in a parking lot in Los Angeles on February 12, 1986. Two other counts charged Tanner with distribution of smaller amounts of heroin on January 14, 1986, and September 3, 1985. Tanner pled guilty to Count I, which involved only the parking lot transaction. The presentence report from the California prosecution expressly states that the remaining counts were dismissed in consideration of his plea. After Tanner was named in the St. Louis indictment, he moved for dismissal on the grounds that the second prosecution constituted double jeopardy. We affirmed the denial of his motion. *United States v. Tanner*, 860 F.2d 864 (8th Cir.1988). We consider now only whether Tanner's plea agreement was violated.

Two of the dismissed counts regarded sales of heroin to Brenda LaMotte. Her testimony in the St. Louis prosecution described those sales, made in California, although Tanner was charged in the present case only with the shipping of drugs to St. Louis. We cannot say, however, that the admission of this evidence violated the plea agreement because the indictments did not overlap. Tanner perhaps assumed that his plea covered all his past contact with LaMotte. It did not; the plea concerned only the specific acts charged in the California indictment.

### III.

For the foregoing reasons, we affirm the convictions of each defendant.