# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1071

_____

United States of America,

*Plaintiff - Appellee,*

v.

Momodu Babu Sesay,

*Defendant - Appellant.*

_____

No. 18-1979

_____

United States of America,

*Plaintiff - Appellee,*

v.

Saddam Samaan Daoud Samaan,

*Defendant - Appellant.*

_____

No. 18-3046

_____

United States of America,

*Plaintiff - Appellee,*

v.

Fester Sayonkon,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: June 13, 2019
Filed: September 11, 2019

_____

Before COLLOTON, KELLY, and ERICKSON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Fester Sayonkon and Saddam Samaan of aggravated identity theft and conspiracy to commit bank fraud. *See* 18 U.S.C. §§ 1028A, 1344, 1349. A third defendant, Momodu Sesay, pleaded guilty to one count of conspiracy to commit bank fraud and testified for the prosecution. The district court[1] sentenced the defendants to terms of imprisonment. Sayonkon and Samaan appeal their convictions, and all three defendants challenge their sentences. We affirm the judgments.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

## I.

In 2008, the Minnesota Financial Crimes Task Force began receiving reports of an uptick in counterfeit checks deposited at banks around the Minneapolis-St. Paul area. An investigation revealed a three-tiered check-fraud scheme. "Check printers" generated counterfeit checks using check-writing software, blank check stock, and valid bank account and routing number information. "Runners" negotiated or deposited the fraudulent checks, often opening their own bank accounts and attempting to withdraw as much cash as possible before the fraud was discovered. "Recruiters" solicited and managed runners, transported them to bank locations, coached them on how to carry out the transactions, and served as the intermediaries between the printers and the runners.

The Task Force identified Sesay and Sayonkon as two of the primary check printers and recruiters. At trial, Sesay admitted that from October 2009 to December 2012, he generated up to six counterfeit checks per month, and coordinated a team of runners and recruiters to negotiate or deposit those checks. During this same period, Sayonkon printed his own fraudulent checks and recruited runners, but also obtained fraudulent checks from Sesay and shared information and coordinated runners with him.

In late 2011, Sayonkon recruited Samaan to the conspiracy. Samaan was incarcerated at the time, but he began providing Sayonkon with the names and addresses of contacts in Jordan who might serve as runners and negotiate counterfeit checks. After his release in March 2012, Samaan served as a runner for Sayonkon.

In June 2012, the Task Force executed a search warrant at an apartment shared by Sesay and another conspirator. Investigators seized two laptops loaded with VersaCheck, a check-writing software designed for small businesses. Data obtained from the computers showed names of payees and other details about the checks

generated by the software. Investigators matched these payees to a number of known runners, including Sayonkon. After Sesay agreed to cooperate with authorities, he acknowledged that from October 2009 through June 2012, he and his fellow conspirators caused or intended to cause over $1.4 million in losses at more than forty financial institutions.

A grand jury charged Sesay, Sayonkon, Samaan, and three others with conspiracy to commit bank fraud, *see* 18 U.S.C. §§ 1344, 1349, and alleged that Sayonkon and Samaan committed aggravated identity theft. *See id.* § 1028A. Sesay pleaded guilty to one count of conspiring to commit bank fraud, and became a witness for the government. A jury convicted Sayonkon and Samaan of the conspiracy and aggravated identity theft charges.

At Sesay's sentencing, the court departed downward from the advisory guideline range and imposed a term of 63 months' imprisonment. Sayonkon was sentenced to a total of 151 months in prison and Samaan to 87 months' imprisonment.

II.

Sayonkon and Samaan challenge their convictions for conspiracy to commit bank fraud. Each argues that the government presented evidence of two separate conspiracies and created a prejudicial variance from the single conspiracy charged in the indictment. Where a defendant claims a variance based on proof of multiple conspiracies, we will reverse only if the evidence is insufficient to support a finding of a single conspiracy and the defendant was prejudiced. *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010).

The evidence presented at trial supports the jury's finding of a single conspiracy. Sayonkon played a key role in the conspiracy, serving as both a check printer and a recruiter. Sayonkon brought Samaan into the fold, recruiting him while

he was still incarcerated. Samaan quickly became an active member in the conspiracy: jailhouse telephone calls reveal that he encouraged Sayonkon to send counterfeit checks to Samaan's relatives in Jordan, where Samaan believed his contacts would cash them and send back the resulting gains.

While still in jail, Samaan also gained the confidence of another inmate, K.F. Samaan acquired legitimate account information for K.F.'s former employer, Visi, Inc., and for K.F.'s 401(k) account at BNY Mellon Asset Servicing. Sayonkon and Sesay used K.F.'s information to produce several counterfeit checks that drew on these accounts. Data gathered from Sesay's VersaCheck program included account information for Visi, Inc. Sesay himself signed and deposited a check allegedly from Visi, Inc. in April 2012. During April and May 2012, Samaan deposited fraudulent checks linked back to Sesay's computer and was arrested in possession of more such checks.

This evidence is sufficient to show that Samaan, Sayonkon, and Sesay were participants in one check-writing fraud scheme. A reasonable jury could have concluded that all three defendants shared a common purpose and acted in furtherance of a single conspiracy. *See Longs*, 613 F.3d at 1176.

Samaan maintains that his criminal endeavor was separate from the larger conspiracy involving Sesay. He notes that the government presented no evidence that the two defendants knew each other. He highlights Sesay's testimony that he did not remember anything about the Visi, Inc. account and did not recall working with Samaan as part of the check-fraud scheme. This argument is unavailing, for there is no requirement that all conspirators know each other. *United States v. Watts*, 950 F.2d 508, 512 (8th Cir. 1991). "A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." *Longs*, 613 F.3d at 1176 (internal quotation omitted).

Sayonkon also argues that the district court erred in denying his request for a jury instruction on multiple conspiracies. He contends that without the instruction, the jury may have improperly transferred guilt from one conspiracy to another. Sayonkon cites a question from the jury during deliberations about whether it was sufficient to find that the two defendants conspired with each other, rather than with the members of the larger conspiracy. He maintains that this inquiry demonstrates the jury's confusion and shows that he was prejudiced by the absence of an instruction on multiple conspiracies.

Even assuming for the sake of analysis that the evidence supported giving a multiple-conspiracies instruction, *see United States v. Nevils*, 897 F.2d 300, 307 (8th Cir. 1990), Sayonkon cannot demonstrate prejudice from the court's unwillingness to include it. Sayonkon was free to argue his multiple-conspiracies theory to the jury, and the court instructed the jury that it could convict him only if he was a member of the single conspiracy charged in the indictment. When the jury asked a question about conspiracy law, the court properly referred the jury back to the indictment and the instructions. "If the evidence supports a single conspiracy, the failure to give a multiple conspiracies instruction is not reversible error." *United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998). As noted, the government presented sufficient evidence of a single conspiracy involving Sesay, Sayonkon, and Samaan, so there was no reversible error in the instructions.

III.

Samaan raises two more challenges to his conviction. He first claims that the district court erred in denying his motion to suppress evidence gathered when police examined the guest registry at a motel where he was staying. While Samaan was registered at a motel in August 2012, officers inspected the registry and used the information to check for outstanding warrants. While performing this work, officers determined that Samaan had presented a fraudulent identification card to the motel.

-6-

The next day, officers followed Samaan as he left the motel. When Samaan stopped in a parking lot, officers approached him concerning a traffic violation. After he failed to provide a legitimate form of identification, police arrested him. Officers seized a fake Minnesota identification card from Samaan's wallet and other documents from his vehicle. These materials included a resident alien card for a person with initials D.S.A., a social security card for D.S.A., and several counterfeit checks. Police then executed a search warrant at Samaan's motel room and seized a computer and a printer.

Samaan argues that the search of the motel's guest registry violated his Fourth Amendment rights, and that the evidence seized from his hotel room and during the traffic stop must be suppressed as fruit of an unlawful search. To establish a violation of rights under the Fourth Amendment, a person must have a "constitutionally protected reasonable expectation of privacy" in the area searched or the items seized. *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). A motel guest, for example, has a reasonable expectation of privacy in his rented room. *See United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). Samaan argues that he also had a reasonable expectation of privacy in his *registration* as a guest at the motel, and that officers violated his Fourth Amendment rights by demanding to inspect the registry. He relies on *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), which held that "*a hotel owner* must be afforded an opportunity to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply." *Id.* at 2453 (emphasis added and omitted).

Samaan's contention fails under the so-called third-party doctrine: "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). Even where a person discloses information to a third party "on the assumption that it will be used only for a limited purpose," the government typically is free to obtain that information

without infringing on a legitimate expectation of privacy of the person who made the original disclosure. *See United States v. Carpenter*, 138 S. Ct. 2206, 2216 (2018) (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)). While this doctrine does not extend to the novel phenomenon of cell phone location records, *id.* at 2217, it encompasses checks and deposit slips retained by a bank, income tax returns provided to an accountant, and electricity-usage statistics tracked by a utility company. *See McIntyre*, 646 F.3d at 1111 (collecting cases). We conclude that Samaan likewise had no legitimate expectation of privacy in the identification card that he provided when registering at the motel. *Patel*'s ruling in favor of hotel owners does not support Samaan's contention. The Court did not hold that *motel guests* have a privacy interest in registration records; to the contrary, the decision acknowledged that "hotel operators remain free to consent to searches of their registries." 135 S. Ct. at 2454.

Samaan next challenges the sufficiency of the evidence supporting his conviction for aggravated identity theft under 18 U.S.C. § 1028A(a)(1). Although he concedes that he used an identification card bearing the name of a person with the initials D.S.A. when opening bank accounts, he claims that the government failed to show that D.S.A. was a real person and that Samaan knowingly stole his identity.

The evidence supports the jury's finding. At the time of Samaan's arrest, police seized a fake Minnesota identification card from Samaan's wallet and resident alien card and social security cards for D.S.A. from Samaan's vehicle. Although the identification card bore Samaan's photograph, the name matched that from D.S.A.'s legitimate resident alien and social security cards, and the birth date varied from D.S.A.'s by only one day. The government presented D.S.A.'s Michigan driving records and California driver's license to prove that the resident alien card belonged to a real person. The resident alien card displayed a photograph of a person who was not Samaan. And Samaan used the Minnesota identification and the social security card to open various bank accounts. Viewing the record in the light most favorable

to the verdict, a reasonable jury could find that Samaan knowingly used another person's identification.

Samaan also suggests that the statute's requirement that an offender knowingly use "a means of identification *of another person*" means that the government must prove the theft of a *living* person's identity. *See* 18 U.S.C. § 1028A(a)(1) (emphasis added). Samaan did not raise this point in a motion for judgment of acquittal, so we review for plain error, *United States v. Samuels*, 874 F.3d 1032, 1036 (8th Cir. 2017), and the contention is foreclosed in any event by circuit precedent. We held in *United States v. Kowal*, 527 F.3d 741 (8th Cir. 2008), that "another person" includes both the living and the deceased. *Id.* at 746-47. Samaan questions the continuing vitality of *Kowal* after *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), where the Supreme Court concluded that § 1028A(a)(1) requires proof "that the defendant knew that the means of identification at issue belonged to another person." *Id.* at 657. But *Flores-Figueroa* did not address liability for the theft of a decedent's identity and thus did not undermine *Kowal*'s conclusion that "person" in § 1028A(a)(1) includes a deceased person.

IV.

All three defendants challenge their sentences. Sayonkon contends that the district court erred in applying a two-level increase under the advisory sentencing guidelines for his role as "an organizer, leader, manager, or supervisor" of the check-fraud scheme. USSG § 3B1.1(c). He describes himself as "simply a participant," and argues that he "never controlled or directed the actions of others." We review the district court's interpretation and application of the guidelines *de novo* and its factual findings for clear error. *United States v. Markert*, 732 F.3d 920, 932 (8th Cir. 2013).

Although mere participation in a conspiracy is not sufficient to establish a leadership role, the two-level increase applies if a defendant was the organizer,

leader, manager, or supervisor of one other participant in criminal activity that did not involve five or more persons. USSG § 3B1.1(c) & comment. (n.2). Sayonkon managed at least one runner as part of the charged conspiracy from October 2009 through December 2012. Sayonkon also recruited Samaan into the conspiracy, and he coordinated sending counterfeit checks to Samaan's contacts in Jordan while Samaan was still in jail. The district court did not clearly err in applying an increase under § 3B1.1. Whether Sayonkon should have received a three- or four-level increase based on criminal activity involving five or more participants is not before us, because the government has not cross-appealed. *See Greenlaw v. United States*, 554 U.S. 237 (2008); *cf.* USSG § 3B1.1(a), (b).

Samaan argues that the district court erred in calculating his loss amount at more than $250,000 and applying the corresponding twelve-level increase to his base offense level under USSG § 2B1.1(b)(1)(G). He claims that the district court's finding of $395,535.87 was inflated and that the evidence supported a loss of no greater than $95,000 and a six-level increase. *See id.* § 2B1.1(b)(1)(D). We review a district court's loss calculation for clear error. *See United States v. Killen*, 761 F.3d 945, 948 (8th Cir. 2014).

Under the guidelines, the district court is to "make a reasonable estimate of the loss" by considering "the greater of actual loss or intended loss." USSG § 2B1.1, comment. (n.3(A), (C)). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict," *id.* § 2B1.1, comment. (n.3(A)(ii)), and it includes actual losses suffered. *See United States v. Ware*, 334 F. App'x 49, 50 (8th Cir. 2009) (per curiam); *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000).

The district court did not clearly err in concluding that Samaan was responsible for a loss amount of over $250,000. In the period from May 23 to May 29, 2012, Samaan deposited and was arrested in possession of counterfeit checks valued at $83,670.68. Investigators seized counterfeit checks totaling at least another

$236,112.12 from the vehicle that Samaan was driving at the time of his second arrest in August 2012. This evidence totals $319,782.80 and supports the court's finding that Samaan was responsible for an intended loss of over $250,000.

Sesay challenges the length of his sentence. He disputes the extent of the district court's downward departure under the guidelines, but alleges no unconstitutional motive by the court, so the extent of the downward departure is unreviewable. *United States v. Sykes*, 356 F.3d 863, 865 (8th Cir. 2004).

Sesay also contends that the sentence is unreasonable under 18 U.S.C. § 3553(a), and we review that challenge under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). Sesay complains that the district court gave too little weight to his difficult childhood, his significant family responsibilities, an asserted low risk of recidivism, and the substantial assistance that he provided to the government. The district court expressly addressed Sesay's familial responsibilities and provision of assistance, and presumably considered the other proffered mitigating circumstances. But the court also weighed Sesay's lengthy criminal history, his failure to maintain legitimate employment, and his violation of the terms of his supervised release. Given the deference accorded to the district court in balancing the relevant factors, we conclude that the district court did not abuse its discretion in imposing Sesay's below-guidelines sentence.

*        *        *

For the foregoing reasons, the judgments of the district court are affirmed.

_____