977 F.2d 399
 70 A.F.T.R.2d 92-5930, 92-2 USTC P 50,506
 UNITED STATES of America, Appellee,
v.
Eugene R. ROSNOW, Appellant.
UNITED STATES of America, Appellee,
v.
Melford H. HAUGEN, Appellant.
UNITED STATES of America, Appellee,
v.
Juanita M. DEWEY, Appellant.
UNITED STATES of America, Appellee,
v.
David C. RODEWALD, Appellant.
UNITED STATES of America, Appellee,
v.
Kermit H. RODEWALD, Appellant.
UNITED STATES of America, Appellee,
v.
Wallace H. RODEWALD, Appellant.
UNITED STATES of America, Appellee,
v.
Leland Frederick ERICKSON, Appellant.
UNITED STATES of America, Appellee,
v.
Robert M. DICK, Appellant.
UNITED STATES of America, Appellee,
v.
Harry E. CARLSON, Appellant.
UNITED STATES of America, Appellee,
v.
Duane C. HANSEN, Appellant.
UNITED STATES of America, Appellee,
v.
Roger Walter SANDS, Appellant.
UNITED STATES of America, Appellee,
v.
Dennis W. SANDS, Appellant.
UNITED STATES of America, Appellee,
v.
Jeffry R. MORSE, Appellant.
UNITED STATES of America, Appellee,
v.
George A. YANT, Appellant.
UNITED STATES of America, Appellee,
v.
Karl H. PETERS, Appellant.
 Nos. 91-2945 to 91-2948, 91-2952, 91-2956, 91-2957, 91-2968,
91-2978 to 91-2981 and 91-2984 to 91-2986.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 9, 1992.
Decided Oct. 1, 1992.
Rehearing and Rehearing En Banc
Denied Nov. 25, 1992.*
 
 Whitney Edward Tarutis, Bemidji, Minn., for appellants Rosnow, Erickson, Hansen and Yant.
 Jonathan E. Fruchtman, Minneapolis, Minn., for appellant Haugen.
 Virginia Villa, Minneapolis, Minn., for appellant Dewey.
 Arthur R. Martinez, Minneapolis, Minn., for appellant D. Rodewald.
 Thomas M. Kelly, Minneapolis, Minn., for appellant K. Rodewald.
 Lawrence E. Meirwissen, St. Paul, Minn., for appellant W. Rodewald.
 Jerome Helfand, St. Paul, Minn., for appellant Dick.
 Michael James Majeski, Minneapolis, Minn., for appellant Carlson.
 Richard Paul Clem, Minneapolis, Minn., for appellants R. Sands, D. Sands and Peters.
 Joseph E. Paiement, Minneapolis, Minn., for appellant Morse.
 Jeffrey S. Paulsen, Minneapolis, Minn., for appellee.
 Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and VAN SICKLE, Senior District Judge.
 PER CURIAM.
 
 
 1
 Several defendants[1] challenge their convictions on thirty-four counts arising from conduct relating to filing false tax forms with the Internal Revenue Service (IRS). All of the defendants, with the exception of Robert Dick, were convicted of conspiracy to file false IRS forms. 18 U.S.C. § 371 (1988). The indictment stated the objectives of the conspiracy as follows: (1) to report false information to the IRS in order to cause tax problems for persons whom the defendants felt had wronged them; (2) to report false information to the IRS in order to obtain refunds; (3) to market a scheme designed to accomplish these objectives; (4) to use counterfeit certified sight drafts to obtain money from the IRS; and (5) to impede and corrupt the lawful functions of the IRS. Additionally, twelve of the defendants[2] were convicted of the substantive charge of filing false tax forms 1096 or 1099 with the IRS. 26 U.S.C. § 7206(1) (1988). Dick, Dewey, Haugen and Yant were convicted under the same statute of submitting false forms 1040, requesting tax refunds. Carlson, Dewey, Erickson, Haugen, Rosnow, and Roger Sands were convicted of attempting to impede or obstruct an IRS investigation under 26 U.S.C. § 7212(a) (1988). And Dewey was convicted of possession of counterfeit government obligations with the intent to defraud. 18 U.S.C. § 472 (1988). The defendants present several diverse claims on appeal. After an extensive review of the record, we reverse the conspiracy convictions of all defendants. We affirm all other convictions.
 
 BACKGROUND
 
 2
 IRS form 1099 is an informational form used to report to the IRS income or other compensation paid to a non-employee, such as a sub-contractor. The information contained in forms 1099 may be communicated to the IRS through the use of a single summary and transmittal form 1096. The defendants allegedly filed these forms in an effort to cause tax problems for individuals involved in repossessing real estate and other property belonging to defendants following the latter's default on various loans. The victims included creditors, attorneys, judges, sheriffs, law enforcement officials and IRS agents. Frequently, the defendants would mail copies of the forms 1099 to the individuals referenced on the forms as well as the IRS. Except for Juanita Dewey, each of the defendants charged with filing false forms 1096 or 1099 with the IRS submitted forms claiming to have paid out more than $4 million to the above described individuals. For example, George Yant filed four forms 1099 in the total amount of $28 million; Eugene Rosnow filed 103 forms 1099 totalling over $187 million; and Harry Carlson filed thirteen forms totalling over $86 million. Typically, a defendant would send an individual fictitious bills prior to filing the false forms; the logic being that the unpaid debt is essentially the same as income received to the referenced individual, and that the individual should therefore be required to pay income tax on the amount reported.
 
 
 3
 Most of the defendants are relatively uneducated farmers residing in the same geographic region in northwest Minnesota. It is a point of contention as to how they first became involved in this scheme. The plan was created by unindicted co-conspirators Roger Elvick, Natalie Telemaque and Ron Knutt, who are acquainted with Juanita Dewey. Several defendants indicated that they learned of the scheme through a book published by Elvick entitled "The Redemption Package."[3] Others claim to have learned of the scheme through various newspaper and magazine articles. Elvick, Telemaque and Knutt were convicted in a separate trial in North Dakota.[4] As indicated above, the defendants apparently sought a measure of revenge against those individuals who they believed had committed wrongs against them. As a result of the filings, some of the victims received audit letters from the IRS, and some incurred attorney's fees.[5] Additionally, the IRS found it necessary to instigate new manual procedures and hire new employees to check the veracity of the incoming forms.[6]
 
 
 4
 IRS officials first became suspicious of the defendants' actions after noticing that an inordinate number of forms stated "request denied" in the space for the referenced individual's social security number.[7] Between February of 1989 and January of 1990, officials at the Kansas City IRS Service Center intercepted forms containing this notation and began forwarding these forms to the criminal investigation unit.[8] After checking the reported payments against the referenced individuals' reported income (usually reported in forms 1040), IRS officials discovered the amounts reported by defendants did not comport with the income reported by the individuals referred to on the forms. A criminal investigation ensued and IRS officials came to believe that the payments or unpaid debts reported by defendants were fictitious.
 
 
 5
 In March of 1990, law enforcement officers executed search warrants for the residences of six of the defendants who were thought to have sent false forms. At the condominium shared by Juanita Dewey and Melford Haugen, located in Detroit Lakes, Minnesota, a two and one-half hour search yielded a calendar indicating Dewey's acquaintance with several other defendants, correspondence between Dewey and several defendants, IRS forms, court transcripts pertaining to lawsuits of various defendants and blank counterfeit sight drafts allegedly payable out of the United States Treasury. At the Carlson farmhouse located in rural Becker, Minnesota, amongst hundreds of files unrelated to this case, investigators discovered six files each labelled with a defendant's name containing past due statements, tax forms, letters from attorneys and court documents. Apparently as a result of these searches, Carlson, Rosnow and Erickson requested the social security numbers of some of the investigators involved in the search and Dewey and Haugen filed false currency transaction reports (CTR's)[9] and meritless federal tort claims against the investigators. Because of these actions, the named defendants were charged with attempted obstruction of an IRS investigation.
 
 
 6
 The case proceeded to trial on March 1, 1991. At the close of the government's case, the defendants moved for a judgment of acquittal on the conspiracy charge. The motion was denied. On April 8, 1991, the jury returned a verdict of guilty on all thirty-four counts of the indictment. The sentences imposed range from eleven to twenty-seven months of incarceration.
 
 DISCUSSION
 Conspiracy
 
 7
 We initially turn to the sole meritorious claim affecting most of the defendants. The defendants argue the government failed to prove the existence of the single overall conspiracy charged in the indictment.
 
 
 8
 The government argues that all of the defendants shared the common goal of harassing their perceived enemies through the use of fraudulent claims to the IRS and that mutual assistance and dependence existed. The government maintains that Juanita Dewey and Harry Carlson each headed up a core group of defendants and the two groups were linked through various cooperative efforts.
 
 
 9
 The evidence put forth at trial included the six files discovered at the Carlson residence labeled with the names of defendants Erickson, Hansen, David Rodewald, Kermit Rodewald, Wallace Rodewald and Rosnow.[10] The files contained various tax forms, including forms 1096 and 1040, past due bill statements and notices of bills currently due. At the Dewey-Haugen condominium, investigators found notes written on a calendar which referred to defendants Haugen, Yant, Peters, David Rodewald, Kermit Rodewald and unindicted co-conspirator Knutt. Investigators also discovered letters addressed to Dewey from Morse, Telemaque[11] and Knutt. Also uncovered at the Dewey-Haugen residence, was a piece of paper with Dennis and Roger Sands' address and phone number written on it and a letter addressed to the IRS from Reed Glawe, who the Sands reported having paid over $630,000.00, stating that he had not been paid any compensation from the Sands in 1989. Finally, investigators also turned up legal papers relating to adverse decisions against Hansen and Peters, which the government maintains served as the catalyst for those defendants' actions.
 
 
 10
 The government also presented expert analysis of various typewritten documents prepared by defendants indicating that Carlson, Hansen, Kermit Rodewald, Wallace Rodewald and Rosnow used the same typewriter; while David Rodewald, Haugen, Dewey, Yant, and Peters used another. Additionally, some of the defendants testified to being acquainted with each other and to having discussed the filing of the forms 1099 on occasion,[12] and Rosnow and Erickson had accounts with Common Title Bond and Trust, a fraudulent entity whose promoters, including Harry Carlson, have been enjoined from continuing to do business by the Minnesota Attorney General. Finally, the evidence showed that several defendants functioned as notaries for the others: Kermit Rodewald notarized documents for his brother David, Rosnow, Carlson, Hansen, and Dewey; Carlson's wife, Debra, notarized documents for Rosnow, David Rodewald, Kermit Rodewald, Wallace Rodewald and Hansen; and Erickson notarized documents for Hansen.
 
 
 11
 While this evidence may show, as the government urges, that Dewey and Carlson each headed up a core group of defendants, the record belies the existence of an overall conspiracy between all of the defendants.
 
 
 12
 We recognize that in order to prove a single conspiracy it is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other. United States v. Lemm, 680 F.2d 1193 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). However,
 
 
 13
 [f]or a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two [or more] conspiracies rather than one are charged.
 
 
 14
 United States v. Levine, 546 F.2d 658, 663 (5th Cir.1977)[13] (citations omitted); see also United States v. Fernandez, 892 F.2d 976, 986 (11th Cir.1989), cert. dismissed, 495 U.S. 944, 110 S.Ct. 2201, 109 L.Ed.2d 527 (1990); United States v. Castro, 829 F.2d 1038, 1045 (11th Cir.1987). Put another way, a "common purpose of a single enterprise must motivate each participant and each act" and "mere knowledge of another similarly motivated conspiracy or an overlap in personnel do [sic] not prove one overall agreement." United States v. Snider, 720 F.2d 985, 988 (8th Cir.1983), cert. denied, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984); see also United States v. DeLuna, 763 F.2d 897, 918 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); United States v. Jackson, 696 F.2d 578, 582 (8th Cir.1982), cert. denied, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).
 
 
 15
 The evidence shows that Haugen, Morse, Peters and the Sands brothers were associated only with Dewey; no evidence was presented that they implicitly or explicitly joined any agreement or even knew of, much less interacted with, any other defendant in this case. Nor was sufficient evidence presented to indicate an association between Wallace Rodewald and any other defendant except for Carlson and possibly his brother Kermit.[14]
 
 
 16
 This case is distinguishable from the typical "chain" conspiracy case, where each member plays a different but pivotal role in the overall success of the group. For example, in the typical drug distribution conspiracy you may find a manufacturer who produces the product; a supplier who buys the contraband from the producer; distributors who buy from the supplier and sell to smaller dealers or users; and security personnel who protect the sale proceeds and see to the members' safety. Whatever the product, the purpose of the conspiracy is to put the commodity into the hands of the ultimate consumer. The success of the group as a whole is dependent upon the ability of each member to fulfill his responsibilities. Thus, unlike the wheel conspiracy, the defendants' knowledge of the existence of remote links in the chain may be inferred solely from the nature of the enterprise. See Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387, 390 (1957) (contrasting the knowledge requirement for "wheel" and "chain" conspiracies).
 
 
 17
 By comparison, except for Dewey who appears to have been connected with the marketers of this scheme, no member of this group stood to gain a thing by the success of a fellow defendant. Nor was any single defendant's probability of success affected by the success of another defendant. There is no evidence that the defendants were motivated by the "common purpose of a single enterprise." Snider, 720 F.2d at 988. They engaged in similar acts for similar reasons. Some were assisted by the same people. Some knew each other. But the evidence fails to indicate that there was mutual assistance or dependence between most of these defendants. See DeLuna, 763 F.2d at 918. It appears that they engaged in these actions in order to benefit themselves individually, to gain revenge on their individual perceived enemies, and not to benefit the group as a whole. They did not care about the success of the other defendants, and for the most part they did not assist the other defendants. Thus, we hold it was mere speculation for the jury to find beyond a reasonable doubt the existence of a single conspiracy between all of the defendants charged.
 
 
 18
 The existence of multiple conspiracies, however, does not necessarily require reversal of the defendants' conspiracy convictions. The issue then becomes whether the variance between the indictment and the proof presented at trial so prejudiced the defendants as to entitle them to reversal. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1945).
 
 
 19
 In Kotteakos, thirteen defendants were charged with a single conspiracy to violate provisions of the National Housing Act. The Court found the evidence at trial proved the existence of at least eight separate conspiracies, each revolving around a single individual who acted as a broker in securing federal loans based upon the peripheral defendants' fraudulent applications. In holding that the error affected defendants' substantial rights, the Court emphasized the trial court's failure to give a multiple conspiracy instruction where the "jury could not possibly have found, upon the evidence, that there was only one conspiracy." Kotteakos, 328 U.S. at 768, 66 S.Ct. at 1249. Not only did the erroneous instruction allow the jury to find a single conspiracy where several were proven, it also prevented the Court from giving a precautionary instruction
 
 
 20
 such as would be appropriate, perhaps required, in cases where related but separate conspiracies are tried together under § 557 of the Code, namely, that the jury should take care to consider the evidence relating to each conspiracy separately from that relating to each other conspiracy charged.
 
 
 21
 Id. at 769-70, 66 S.Ct. at 1250 (footnotes omitted).
 
 
 22
 This court has also emphasized the importance of limiting instructions in similar situations: "When the proof at trial reveals the existence of more than one conspiracy, 'the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood [that] confusion or prejudice' resulted from transference of guilt from one conspiracy to another." Jackson, 696 F.2d at 584 (quoting United States v. Johnson, 515 F.2d 730, 735 (7th Cir.1975)); see also Snider, 720 F.2d at 990 (finding prejudicial variance where limiting instruction not given though it "might have prevented the jury from transferring guilt properly associated with [appellant's] crimes to the [other] appellants."); cf. United States v. Griffin, 464 F.2d 1352, 1357 (9th Cir.) (trial court "placed a clamp on any possible prejudice which might have seeped from the variance" by instructing the jury that if they did not find a single overall conspiracy, they could find the defendant guilty of one of the multiple conspiracies, but only if his guilt was established on the basis of only the evidence relating to the specific conspiracy with which he was involved), cert. denied, 409 U.S. 1009, 93 S.Ct. 447, 34 L.Ed.2d 302 (1972).
 
 
 23
 The trial court in the instant case failed to give a multiple conspiracy instruction though the evidence proved the existence of several separate groups of conspirators. The court did admonish the jury that in order to convict a defendant of conspiracy, the evidence must show that the defendant was a member of the single conspiracy charged in the indictment and not some other separate conspiracy. However, we have held that where a single overall conspiracy could not be found on the record, "the defendants were entitled to an instruction to that effect." Jackson, 696 F.2d at 586. And where such instructions have not been given, we are obligated to give "heightened scrutiny" to the possibility "that the jury erroneously 'transfer[red] guilt from one to another and [found] defendants guilty of an overall conspiracy.' " Id. (quoting United States v. Varelli, 407 F.2d 735, 747 (7th Cir.1969), cert. denied, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972)).
 
 
 24
 We believe the defendants here suffered from "unwarranted imputation of guilt from others' conduct," constituting a prejudicial variance on the charge of conspiracy. See Kotteakos, 328 U.S. at 777, 66 S.Ct. at 1253. The record is replete with evidence of inflammatory actions of individuals which, especially in light of the length and complexity of the trial, the jury could have easily applied to the group as a whole. See Jackson, 696 F.2d at 587 ("danger that evidence of the other defendants' guilt would be imputed to [defendant] was heightened by the inflammatory nature of much of the evidence presented"); United States v. Bledsoe, 674 F.2d 647, 658-59 (8th Cir.) (lengthy and convoluted presentation of evidence prejudicially impaired jury's ability to separate evidence), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).[15] Here, Juanita Dewey was shown to be closely associated with Telemaque, Knutt, and Elvick, who originated and marketed the Redemption Package. The evidence indicated that Telemaque had even asked Dewey to help her launder money obtained through the scheme. Harry Carlson was shown to have promoted a fraudulent financial institution which had been enjoined from doing business by the Minnesota Attorney General. Extensive testimony was admitted regarding confrontations between Carlson, Hansen, Erickson, Peters, and David Rodewald with police officers, judges, court personnel and other respected community members. Hansen's criminal record containing a conviction for assault on a police officer and contempt of court was also revealed to the jury. The presentation of this evidence undoubtedly increased the jury's natural aversion for those who show disrespect for authority figures.
 
 
 25
 Also of critical importance in determining the question of prejudicial variance is the number of defendants involved, the number of conspiracies and the length and complexity of the trial. In distinguishing Kotteakos from Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934), a case of variance involving four defendants and two conspiracies, the Court observed:
 
 
 26
 The sheer difference in numbers, both of defendants and of conspiracies proven, distinguishes the situation. Obviously the burden of defense to a defendant, connected with one or a few of so many distinct transactions, is vastly different not only in preparation for trial, but also in looking out for and securing safeguard against evidence affecting other defendants, to prevent its transference as "harmless error" or by psychological effect, in spite of instructions for keeping separate transactions separate.
 
 
 27
 Kotteakos, 328 U.S. at 766-67, 66 S.Ct. at 1249. While noting "the Court of Appeals painstakingly examined the evidence relating directly to each of the petitioners" and "found it convincing to the point of making guilt manifest," the Court in Kotteakos held that the substantial rights of the defendants were affected: "That right, in each instance, was the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others as shown by this record." Kotteakos, 328 U.S. at 775, 66 S.Ct. at 1253. In the instant case, the jury sat through a trial lasting for over a month, involving fifteen different defendants, thirty-four separate counts, hundreds of exhibits and the complexities of the law of conspiracy.
 
 
 28
 Due to the number of defendants, the complexity of the issues, the failure of the court to give a limiting instruction, and the lack of overwhelming evidence of guilt, we hold the variance between the indictment and the proof presented at trial substantially prejudiced the defendants' right to a fair trial on the conspiracy count. Thus, we reverse the conspiracy convictions.
 
 
 29
 We find no merit to the related argument made by defendants Erickson, Peters, Dennis Sands, Roger Sands and Wallace Rodewald, that the district court abused its discretion in denying their respective motions for severance. Because all of the defendants were charged with a single conspiracy, the court properly ruled that the defendants could be tried jointly. See United States v. O'Connell, 841 F.2d 1408, 1432 (8th Cir.1988) (persons charged in a single conspiracy should ordinarily be tried together), cert. denied, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). Though the lack of a unifying count in an indictment necessitates severance of misjoined defendants, the courts "have not similarly ruled that when proof of the single conspiracy count fails as a matter of law, the defendants are entitled to severance." Jackson, 696 F.2d at 585. We now address defendants' varied contentions relating to their substantive convictions.
 
 Admissibility of Evidence
 
 30
 Rosnow, Carlson and Erickson contend the evidence obtained in the search of defendants' residences should have been suppressed since the search warrant was not sufficiently specific. Erickson additionally contends that the warrant affidavit contained factual inaccuracies, and Rosnow argues that the issuing magistrate judge was not neutral.[16] We find no prejudicial error. First, Erickson's objection to alleged factual inaccuracies was not raised at trial, therefore it cannot be raised now.[17] Secondly, the magistrate judge was not a victim of the scheme prior to the issuance of the warrant (Haugen and Dewey filed false documents against the magistrate judge, but not until after the search warrant was executed), therefore his impartiality is not reasonably questionable. See Gray v. University of Arkansas, 883 F.2d 1394, 1397-98 (8th Cir.1989) (test for recusal is whether a reasonable person would question the judge's impartiality). Finally, the magistrate judge's application of the good faith exception, United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), was not clearly erroneous. Although the warrant was defective in a technical sense,[18] the defect would not have been obvious to a reasonable law enforcement officer.
 
 Sufficiency of the Evidence
 
 31
 All but defendants Robert Dick and Dennis Rodewald raise issues of evidentiary sufficiency in one way or another.[19] We find no merit to the argument presented by Dewey, Rosnow, Dennis Sands, Roger Sands and Yant that the government presented insufficient evidence that the false statements defendants made to the IRS were material. Materiality of a statement turns on whether the statement, or form used in this case, has the capacity to influence a government agency's action. United States v. Richmond, 700 F.2d 1183, 1188 (8th Cir.1983). The evidence shows that filing even one of these forms may influence government action by causing the IRS to send an audit notice to the victim. The fact that most of defendants' forms were discovered before the IRS issued notices to the targeted individuals does not obviate the capability of such forms to influence the agency's functions. In addition, as noted previously, the IRS was forced to implement new procedures in order to intercept such forms.
 
 
 32
 Nor does the record support the arguments of Dewey, Erickson, Rosnow and Yant that they filed forms 1096 due to a good faith misunderstanding of the tax law. See Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Rosnow filed 103 false forms 1099 in the total amount of over $187 million. He attempted to tender a $131,000 Common Title Bond and Trust sight draft, though he admitted he knew he did not have any money on account with Common Title Bond and Trust, a fraudulent entity. Erickson sent fifteen false forms 1099 in the amount of nearly $14 million, including a claimed payment of $931,000 to a deputy sheriff who did nothing more than follow a judge's order to remove Erickson from a courtroom after he refused to tell the judge his name. As explained above, Dewey appears to have been one of the instigators of the plan. She assisted several other defendants in their illegal actions and was in contact with Telemaque, Knutt and Elvick, the original marketers of the scheme. Finally, Yant filed his forms 1099 against individuals involved in a replevin action against him which took place twelve years previously. He also filed a false form 1040 seeking an $8 million refund from the United States Treasury.
 
 
 33
 Dewey misinterprets the law in arguing that her conviction for possession of counterfeit sight drafts is not supported by sufficient evidence since the "Certified Sight Drafts" purportedly payable through the Commissioner of the IRS were not actual obligations of the United States. Because the draft is purportedly payable by the Commissioner of the IRS, it can be characterized as an obligation of the United States. Buckner v. Hudspeth, 105 F.2d 393, 395 (10th Cir.1939). Also, there is no similarity requirement for counterfeits in cases involving less recognizable instruments such as government checks and drafts. See id. (conviction affirmed where fake government check held capable of causing injury to another); cf. United States v. Ross, 844 F.2d 187, 189 (4th Cir.1988) (reversing defendant's conviction where black and white photocopied dollar bill would not fool an honest, sensible and unsuspecting person of ordinary observation and care).
 
 
 34
 Dewey, Erickson, Haugen, Rosnow and Roger Sands maintain their obstruction convictions should be reversed because the evidence presented at trial was insufficient to show that their actions had an adverse effect on the government's investigation. Under United States v. Williams, 644 F.2d 696, 699 n. 14 (8th Cir.), cert. denied, 454 U.S. 841, 102 S.Ct. 151, 70 L.Ed.2d 124 (1981), all that is necessary is that the defendants intended to "intimidate or impede" the IRS officers. Here, the defendants' actions evince a clear intent to impede the IRS investigation which was then in progress: Rosnow and Erickson requested the social security numbers of IRS agents who were investigating the case, one of the initial steps towards filing a form 1099 against a person; Roger Sands sent false forms 1099 to IRS agents; and Dewey and Haugen filed false CTR's and federal tort claims against investigative agents.
 
 
 35
 Haugen contends the evidence does not support his alleged involvement with Dewey's preparation of the false CTR's because he did not sign the forms. We find Haugen's involvement in the frivolous federal tort claim asserted against investigative agents to be sufficient evidence to allow a reasonable jury to conclude that Haugen intended to impede the IRS investigation.[20]
 
 
 36
 Erickson and Kermit Rodewald argue that the evidence is insufficient to support their convictions for submitting false forms 1099 to the IRS. Erickson maintains that the government failed to prove the number of false forms that he filed and failed to prove through handwriting analysis that it was he who filed the forms. In actuality, the government introduced fifteen false forms 1099, filed by Erickson with the IRS, in the aggregate amount of over $13 million. Because Erickson stipulated that he filed the documents, handwriting analysis was not necessary.
 
 
 37
 Kermit Rodewald argues that his conviction was unsupported since the government failed to produce the actual forms which he allegedly filed with the IRS. The government, however, did produce audit notices which were sent to two of Rodewald's victims, Zenas Baer and Leonard DuChene.[21] These audit notices constitute evidence sufficient for a reasonable jury to conclude that Rodewald did file the forms with the IRS, since such notices could not be generated unless the IRS had received such forms.
 
 Constitutional Claims
 
 38
 Dewey, Dick, Haugen, David Rodewald and Rosnow appeal from the district court's denial of their motions for self-representation. They urge that at a minimum they were entitled to an additional opportunity to engage in a colloquy with the court to establish their Sixth Amendment right to represent themselves. We hold that each of the defendants was given ample opportunity to discuss their rights with the judge. Their motion testimony did not indicate any misunderstanding about waiver of one's right to counsel; in fact, their motions actually appeared to be aimed at delaying and disrupting the trial.[22]
 
 
 39
 We find no merit to the argument made by Rosnow and Erickson that they were denied a fair trial by the distribution of a booklet of cartoons drawn by one or more defense counsel, which depicted various court personnel and defendants in an unflattering manner. No evidence was presented that the drawings, which were bound together and circulated through at least part of the courtroom, were examined by any member of the jury. Thus, we must hold that no prejudice resulted to defendants as a result of this immature, thoughtless act.
 
 
 40
 Dewey, Dick and Haugen contend that the court erred in denying their motion to disqualify the prosecutor based on an alleged interest in the outcome of the case. We disagree. Though the prosecutor was the subject of a false CTR and a federal tort claim for damages, no evidence indicated the prosecutor suffered adverse consequences due to the defendants' actions. Nor have defendants identified any prejudice resulting from the trial court's refusal to disqualify the prosecutor. See Matter of Grand Jury Subpoena of Rochon, 873 F.2d 170, 176 (7th Cir.1989).[23]
 
 
 41
 David Rodewald argues that the district court abused its discretion and deprived him of his Sixth Amendment right to be tried by an impartial jury by not dismissing the entire jury panel after one juror asked during voir dire if the case had anything to do with the "Posse Comitatus." We find no abuse of discretion. The court dismissed the juror and ruled that the comment did not prejudice the other jurors. Even if the jurors understood what "Posse Comitatus" referred to, there was no implication in the judge's response ("I can't answer questions like that") that the defendants were members of that group. Rodewald argues his Sixth Amendment rights were also violated when the court permitted several defendants to present their closing arguments when Rodewald was absent due to illness. Since the closing arguments given in Rodewald's absence did not mention him, Rodewald was not harmed by his absence. See Snyder v. Massachusetts, 291 U.S. 97, 108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934) (defendant's presence is a condition of due process to the extent that a fair hearing would be thwarted by his absence and to that extent only).
 
 
 42
 Dewey, Dick, Haugen, Peters, Rosnow, Dennis Sands and Roger Sands argue that filing forms 1099 with the IRS is a form of speech protected by the First Amendment. In United States v. Citrowske, 951 F.2d 899, 901 (8th Cir.1991), we rejected an almost identical argument, holding that First Amendment protection is "not so absolute as to protect speech or conduct which otherwise violates or incites a violation of the tax law." Thus, we find defendants' argument meritless.
 
 Sentencing
 
 43
 Carlson, Dennis Sands and Roger Sands contend that they took responsibility for their actions and should receive appropriate sentencing credit. However, the record indicates that each of the defendants testified at trial and showed no remorse for their actions. Thus, we affirm the court's decision not to invoke a departure for acceptance of responsibility. See United States v. Evidente, 894 F.2d 1000, 1003-04 (8th Cir.) (lower court's findings on acceptance of responsibility should be affirmed unless without foundation), cert. denied, 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990).
 
 
 44
 Dewey, Peters, Dennis Sands and Roger Sands contend that the court erred in not granting them downward departures in sentencing. However, a district court's refusal to depart downward is not reviewable. Evidente, 894 F.2d at 1003-04. Dewey asserts that the court misunderstood its authority to depart downward. The sentencing transcript indicates that the court understood its authority to depart downward, but simply found no basis for exercising that authority.
 
 
 45
 Dick, Haugen, Wallace Rodewald, Dennis Sands and Roger Sands argue that the court erroneously increased their sentences under the "official victim" enhancement. Pursuant to our recent holdings in Citrowske, 951 F.2d at 902 and Telemaque, 934 F.2d at 171, the court's upward adjustment was not clearly erroneous.[24]
 
 Miscellaneous
 
 46
 Erickson and Rosnow contend the district court lacks jurisdiction over Title 26 offenses. We disagree. Title 18 U.S.C. § 3231 (1988), grants jurisdiction to district courts over all offenses against the laws of the United States. See United States v. Drefke, 707 F.2d 978, 981 (8th Cir.), cert. denied, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983). Nor do we find merit in Erickson's arguments that (1) the IRS lacked the authority to make this investigation since IRS agents are not agents of the United States government, but are agents for an alien foreign principal, the International Monetary Fund, and (2) he was denied prior notice of the illegality of his actions since the IRS has not published administrative regulations pertaining to the crimes involved in this case.
 
 
 47
 Finally, Rosnow complains certain items seized during the search of his residence, that turned out not to have evidentiary value, were not returned to him in a timely fashion. The record indicates that the delay was caused by miscommunication, not due to bad faith on the part of the government. Thus, we find this argument to be without merit.
 
 
 48
 The judgment of conviction of all defendants charged under count I, in violation of 18 U.S.C. § 371, is hereby vacated. All other convictions on all substantive counts are affirmed. The case is remanded for all defendants with the exception of Hansen and Peters to the district court for resentencing.[25] Hansen and Peters were convicted only under count I. The judgments of conviction of Hansen and Peters are vacated and accordingly the actions ordered dismissed.
 
 
 
 *
 The HONORABLE BRUCE M. VAN SICKLE, Senior United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 The defendants are as follows: (1) Harry Carlson; (2) Juanita Dewey; (3) Robert Dick; (4) Leland Erickson; (5) Duane Hansen; (6) Melford Haugen; (7) Jeffry Morse; (8) Karl Peters; (9) David Rodewald; (10) Kermit Rodewald; (11) Wallace Rodewald; (12) Eugene Rosnow; (13) Dennis Sands; (14) Roger Sands; and (15) George Yant
 
 
 [2]
 Dick, Hansen and Peters were not charged with this violation
 
 
 [3]
 Elvick also made a video explaining the scheme and several defendants indicated they had seen him give promotional speeches. Though called to testify at this trial, Elvick asserted his Fifth Amendment right in refusing to answer any questions
 
 
 [4]
 This court recently affirmed the conviction of Telemaque, the only one of the three who appealed. United States v. Telemaque, 934 F.2d 169 (8th Cir.1991)
 
 
 [5]
 Kermit Rodewald sent false forms to the IRS which resulted in two victims (Zenas Baer and Leonard DuChene) receiving letters from the IRS asking them to explain the discrepancy between their reported incomes and the amounts reportedly paid by Rodewald. After receiving three false forms 1099 from defendant Carlson, Frederick Kirschenmann testified that he turned the matter over to his attorney and incurred attorney's fees in the amount of $1000
 
 
 [6]
 After discovering a number of false claims, the IRS began a new procedure whereby the name of the individual reporting a 1096 or 1099 payment and not reporting the referenced individual's social security number is checked against a list of people known to have submitted fraudulent forms in the past
 
 
 [7]
 Though the form requests the social security number of the referenced individual, the IRS still processes forms which do not contain the number
 
 
 [8]
 The defendants in this case were not the only people engaging in these acts. IRS official Patricia Calhoon testified that the Kansas City Service Center had received well over 2000 of these "questionable" forms
 
 
 [9]
 A CTR is a report made to the IRS which indicates that a cash transaction of at least $10,000 has taken place
 
 
 [10]
 We note that Carlson kept files at his house for hundreds of people not involved in this conspiracy as well
 
 
 [11]
 In one letter, Telemaque sent Dewey a check for $30 and asked Dewey to help her "launder" money obtained through the scheme. In another, she sent Dewey twelve counterfeit sight drafts which were purportedly payable through Fred T. Goldberg Jr., Office of the Commissioner, IRS, Washington, D.C
 
 
 [12]
 Carlson admitted to having assisted "people" in filing forms 1099. Rosnow said he discussed the scheme with defendants Erickson, Kermit Rodewald, David Rodewald and Harry Carlson. Roger Sands called Dewey for advice about the scheme. Erickson travelled to Dewey's house to watch videotapes regarding the scheme and to use Dewey's computer. Peters was a guest in the Dewey-Haugen residence, and left a signed form 1099 behind. Dewey, David Rodewald and Erickson attended a court hearing for George Yant
 
 
 [13]
 In United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), the Supreme Court overruled the portion of Levine that held misjoinder is per se reversible error. Lane, however, did not affect the Levine court's analysis of the requirements of a single "wheel" conspiracy
 
 
 [14]
 Though Wallace Rodewald met with Dewey on one occasion, there is no indication that the conversation involved matters other than religion
 
 
 [15]
 The Supreme Court's holding in Lane, see supra note 13, does not obviate our discussion of prejudice in Bledsoe since we analyzed Bledsoe in terms of harmless error despite our belief that such analysis was not required
 
 
 [16]
 Additionally, Rosnow contends that the seizure of defendants' typewriters was unlawful because the search warrant allegedly did not list typewriters as items to be seized. We disagree. The warrant plainly specified the seizure of typewriters
 
 
 [17]
 Erickson makes the related argument that the IRS lacked the authority to execute a search warrant on his property. We disagree. Congress has given the IRS wide authority to conduct criminal investigations, including the execution of search warrants, regarding those individuals suspected of violating tax laws. See 26 U.S.C. § 7608(a)(2) (1988)
 
 
 [18]
 An accompanying document describing the particular items to be searched for was present with the warrant, but was not properly incorporated into the document
 
 
 [19]
 Since we are reversing defendants' convictions of conspiracy, we need not address the arguments of defendants Hansen, Morse or Wallace Rodewald that there is insufficient evidence to convict them of the charged conspiracy
 
 
 [20]
 Unlike the CTR's, Haugen's signature appears on the transmittal letter accompanying the tort claims. We find no merit in Haugen's contention that this evidence is insufficient because the government did not prove by expert handwriting analysis that the signature was his
 
 
 [21]
 We note that these audit notices are from the year 1988, while Kermit Rodewald allegedly filed the forms 1099 in 1989. In light of the fact that Rodewald admitted to having sent such forms in an interview with IRS agents and the amounts on the forms received by the victims matched the figures listed on the audit notice, we find this evidence sufficient
 
 
 [22]
 Rosnow initially insisted that Whitney Tarutis be allowed to represent him. Because Tarutis was representing four other defendants, the magistrate judge held a hearing to examine the potential conflict of interest. Tarutis was then allowed to represent Rosnow, as well as the other defendants. Rosnow subsequently attempted to fire Tarutis. The magistrate judge denied Tarutis' motion to withdraw based on his finding that Rosnow's actions were initiated "to delay and disrupt the proceedings in this matter." Order, Feb. 1, 1992, at 16
 The following exchanges are representative of the other defendants' conduct:
 The Court: All right. Okay. Are any of you familiar with the federal rules of criminal procedure or the federal rules of evidence? Mr. Haugen?
 Defendant Haugen: I object to that.
 The Court: Ms. Dewey?
 Defendant Dewey: I can't answer that without counsel.
 T.Arr., Nov. 8, 1991, at 31.
 The Court: Do each of--let me advise each of you that if you appear in this court without a lawyer to represent you, that you would give up your right to challenge your conviction if you are convicted of any offense on the ground that you were denied the effective assistance of counsel. Do you understand that, Mr. Haugen?
 Defendant Haugen: I object to that question.
 The Court: Ms. Dewey?
 Defendant Dewey: I don't understand without counsel, and I don't understand why you won't tell me the jurisdiction that we are being tried under so we can prepare for it.
 Id. at 34-35.
 The Court: All I'm asking is do ya understand what I'm tellin' ya? Do you understand that you have the right to be represented by a lawyer, and if you can't afford one the Court will appoint one to represent you free of charge? Do you understand that?
 Defendant David Rodewald: I understand it. I really don't understand, but that's ...
 The Court: You don't understand?
 Defendant David Rodewald: Not really.
 T.Arr., Nov. 15, 1990, at 54.
 
 
 [23]
 We need not address Hansen's claim that the prosecution "planted" an incriminating document in an exhibit pertaining to him since his sole conviction is reversed by our ruling on the conspiracy count
 
 
 [24]
 Dewey, Haugen, Peters, Rosnow, Dennis Sands and Roger Sands also argue that the two-level enhancement they received for obstruction of justice on the conspiracy count constitutes double counting, because the defendants were also convicted of the crime of attempting to impede an IRS investigation. Dewey and Carlson also contend that they should not have been assessed a three-point enhancement for being leaders or organizers of the conspiracy. Because the court applied the enhancement only in relation to the conspiracy conviction, these issues are no longer before us. Similarly we need not address the contentions of defendants Wallace Rodewald, Dennis Sands and Roger Sands that the court applied the wrong section of the guidelines to set their base offense level on the conspiracy charge
 
 
 [25]
 We note that those defendants convicted of both conspiracy and any substantive count received concurrent sentences. Our remand requires resentencing on all substantive counts without regard to the now vacated count of conspiracy